## Louisville & Nashville Railroad Company v. Mitchell.

(Decided February 2, 1917.)

### Appeal from Bourbon Circuit Court.

1. Master and Servant—Damages—Action for by Railroad Conductor —Recovery—Rules.—In an action for damages for injuries received by a conductor in charge of a work train, engaged in hauling dirt and rock, in the railroad yards at Paris, Ky., caused by the caboose of his train, in which he was riding at the time of the accident, being struck by a light engine, the plaintiff was entitled to recover, where it is shown that the rule of the company requiring freight trains to approach yard limits under control, and at a speed of not more than 6 miles per hour, and that the light engine which struck plaintiff's work train was running from thirty to thirty-five miles per hour, thereby violating the rules of the company and at a time when the plaintiff was not violating any rules, and would not have been injured but for said violation of the rules by the trainmen in charge of the light engine.

2. Master and Servant—Injury to Conductor—Information Given by Train Dispatcher.—Plaintiff had a right to rely upon the information given him by the train dispatcher as to the arrival of trains; and, where it is shown that plaintiff, on the morning of the injury, inquired of the dispatcher what train would arrive from the south first, and the train dispatcher informed him that train No. 42 due at Paris at 10:10 A. M. would be the first, when in fact train No. 72, which struck plaintiff's caboose had not arrived and was long past due, plaintiff was not negligent in failing to ascertain that fact, as he had received information from an officer superior to him, supposed to possess such knowledge, that No. 42 would be the first to arrive.

3. Evidence—Competent for Railroad Employee to Testify as to Rules. —It is competent for a plaintiff having twenty-three years' experience as a railroad man, to testify as to the application of the company's rules, in every day practice by the company and employees.

4. Evidence—Construction of Rules of Employer—Instructions.— Where there are written rules introduced in evidence, it is the duty of the trial court to construe such rules, and to instruct the jury as to whether the circumstances in the case justify the application of the rules.

5. Trial—Submission.—The jury is the best judge of the facts, and where there is conflicting evidence upon the facts, the case should be submitted to the jury.

6. Appeal and Error—Damages—When Verdict for Not Excessive.— A verdict for $20,000 damages in favor of a freight conductor, who received such severe injuries that he was unable to do anything, and was a physical wreck, and the injuries are shown to be permanent, is not excessive, where at the time of the injury he was a strong, vigorous man, 46 years of age, and earning from $145.00 to $150.00 per month.

EMMETT M. DIXON and B. D. WARFIELD for appellant.

ROBT. B. FRANKLIN, ROBT. C. TALBOTT and W. H. WHITLEY for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

The appellee, Harry L. Mitchell, instituted this action in the Bourbon Circuit Court to recover damages for a personal injury which he alleges was occasioned him through the negligence of the appellant, Louisville & Nashville Railroad Company, and upon a trial of the case in the circuit court, a verdict for $20,000.00 was returned by the jury, and a judgment was entered thereon in favor of appellee, Mitchell.

From this judgment appellant company prosecutes this appeal, alleging that the trial court committed error to its prejudice: (1) in permitting the plaintiff, Mitchell, to construe and pass upon the reasonableness of the written rules of the company, and their application, in testifying before the jury; and erred in not telling the jury, as matter of law, the meaning of the rules so introduced in evidence, instead of leaving this question to the jury; and,

(2) Because the court overruled the defendant's motion for a peremptory instruction in its favor at the conclusion of the evidence for the plaintiff, and again at the conclusion of all of the evidence; and,

(3) Because the damages recovered by the plaintiff are excessive; and,

(4) The court erred in instructing the jury, particularly in giving the jury inconsistent and irreconcilable instructions.

A statement of the facts is necessary to a fair determination of the questions raised by appellant.

Harry L. Mitchell, a man 46 years of age, and a trainman of twenty-three years' experience, and who had performed the duties of conductor for a period of twelve years, was, while in control of a work train in the yards of defendant company at Paris, Kentucky, injured by a rear end collision on his caboose. The work train of which Mitchell had charge was in the yard and consisted of ten cars upon and into which dirt was being loaded by a steam shovel, and carried by the train a distance of a mile or more north, and discharged. This work had been in progress for some time.

On the morning of the injury conductor Mitchell went to work about 6 o'clock. As his train occupied the main track in the yards, it was necessary for him to know what trains were scheduled to pass on said track during the day. To obtain this information he says he inquired of the train dispatcher what trains would arrive in Paris from the south on that day, and was told, as Mitchell claims, that No. 42, a regular freight train, scheduled to arrive at 10:10 each forenoon, would be the first train from towards Winchester or the south. With this information, he proceeded with his work. Certain passenger trains were due in Paris before Number 42, and these were entitled to the right of way. For the protection of his train, conductor Mitchell placed a flagman on the south to signal any oncoming train, as required by rules of the company, but the steam shovel which was engaged in loading the dirt on the work train, by some accident, was derailed, and as it would take an hour or more to replace it, conductor Mitchell decided to move his train out onto the side track, so as to give the right of way to the passenger train which was due in about an hour. The side track was a safe place for the work train. Accordingly a signal was given the flagman to come in and he did so, catching the rear end of the train, caboose, as it was moving into the siding at the rate of from four to six miles per hour. He immediately hung up his flag on the rear end of the caboose, and started to the front door thereof, when suddenly and unexpectedly to plaintiff, Mitchell, and the flagman, an engine and tender, of train Number 72, running, as it is charged by plaintiff, at a speed of from thirty to thirty-five miles per hour,

ran into the rear end of the caboose, where conductor Mitchell was at the time, demolishing the rear end of the caboose, and injuring the plaintiff severely in his face, arms, legs, and back, from which he has not and from which it is asserted he can never fully recover. His injuries consisted of a fracture of the skull, crushing of the jaw bone, and cheek bone, the loss of several teeth, the loss of hearing in his left ear, impairment of sight in his left eye, inability to masticate his food, injuries to his spinal column, neck and other serious impairments. The steam shovel and other engines were giving off much smoke and steam at the time of the accident and the view was obstructed upon and along the track near where the collision occurred. The accident happened within the yard limits, and train No. 72, which ran into the rear end of conductor Mitchell's work train, was moving in the same direction the work train was going at the time of the accident. The flagman, Larkin, while on duty flagging at the south, for the protection of the work train was, according to the plaintiff's contention, at a position on the track at which he could clearly see a distance of three-quarters of a mile, south, along the track, and at the time he was signaled to come in and go with his train, he testifies that he was keeping a lookout and no trains were in sight coming from the south on the main track.

Plaintiff Mitchell asserts that he made inquiry and was informed by the train dispatcher, and believed that train from the south, No. 42, which arrived at 10:10 each a. m., was the first train, and that he (Mitchell) had no means of knowing of train No. 72 or any other train from the south, except through the train dispatcher, and alleges that he was misled by the statement of the dispatcher that train No. 42 would be the first one to arrive from the south, whereas train No. 72 was the first, arriving some time before 10:10 a. m., and causing his injury. He further relies upon the rules of the company printed in its rule book, which read as follows:

"Yard engines will use tracks within yard limits as prescribed by rule 93, must know what trains are expected and use all possible precautions to protect themselves, especially around curves, in extreme limits of the yard: *Extra trains, freight trains, yard engines, and like engines must not exceed six miles per hour* around curves, or where the view is obstructed, unless track *is known to be clear.*"

Rule 93, is as follows:

"All trains will approach yard limits under control, and run carefully through the limits, expecting to find the main track occupied. Yardmen must, however, use all possible precaution to protect themselves. They must know what trains are expected, and let them pass without delay.

"Within terminals and switching limits, trains occupying the main track must protect themselves against the following movements, and movements at converging points.

"Within yard limits movements on double tracks against the current of traffic, will be made only under protection."

Appellee further relies upon the following order dated September 2nd, 1913, and being order No. 784, which he asserts was in force at the time of the accident:

"Bulletin Board Order No. 784.

"September 2nd, 1913.

"All Concerned:—

"Effective at once. All north bound second class and inferior trains will approach the south switch of drill track at Paris Junction under control and stop, unless the track is seen to be clear, or given a signal by a switchman to proceed.

"Yard engine will use main track against second class and inferior trains while switching."

Asserting that train No. 72, being a freight train, was exceeding six miles per hour while passing through the yard, at a point where the view was obstructed by smoke and steam, and where the track was not known to be clear, violated the rules of the company, and was the proximate cause of the injury. Plaintiff insists that he is entitled to recover if he himself was not violating some rule of the company. On the other hand the defendant company contends that Mitchell as conductor of the work train, was guilty of contributory negligence in failing to comply with the rule wherein trainmen, when within yard limits, are required to *"know what trains are expected, and to use all possible precaution to protect themselves,"* in that plaintiff, Mitchell, failed to keep his flagman on the track south of his train, to warn approaching trains of the occupation of the track

by the work train; and further failed to place torpedoes or other signals on the track to warn approaching trains of the occupation of the main track in the yard. ,

Defendant company relies upon rule 99, which is as follows:

"When a train stops or is delayed under circumstances in which it may be overtaken by another train, the flagman must go back immediately with stop signals to stop any train moving in the same direction. At a point 50 rail lengths, or 1,500 feet, from the rear of his train, he must place one torpedo, on the rail; he must then continue to go back at least 100 rail lengths, or, 3,000 feet from the rear of his train, and place two torpedoes on the rail, 30 feet or one rail length apart, when he may return to a point 70 rail lengths, or 2,100 feet, from the rear of his train, and he must remain there until recalled by the whistle of his engine, but if a passenger train is due within ten minutes, or if an approaching train is within sight or hearing, he must remain until it arrives. If the view is obstructed or if on descending grade, he must go as much further as may be necessary to reach a point where he is absolutely sure that he can be seen by the expected train at a sufficient distance in which to stop. When he comes in, he must remove the torpedo nearest his train; but the two torpedoes must be left on the rail as a caution signal to any following train. When protecting at night the flagman must, the last thing after being recalled, place a lighted fuse upright between the rails at the point where the one torpedo was removed.

An exception may be made only under the following conditions: If on level, or ascending grade, and on a straight line where there is a clear and unobstructed view of the track for at least one mile, the flagman must go back at least thirty rail lengths, or 900 feet, by day, and not less than 70 rail lengths or 2,100 feet, by night. At a point 20 rail lengths or 600 feet, from the rear of his train he must place one torpedo on the rail, and when he has reached the prescribed distance, he must place two torpedoes on the rail, 30 feet or one rail length apart, when he may return to the point where he placed the first torpedo, being governed in other respects by the requirements of the first paragraph of this rule. The front of the train must be protected in the same way by the front brakeman; if he is unable to go, the flagman must be sent in his place."

Rule 99 (B):

"When a freight train stops at a usual stopping place where the rear of the train can be plainly seen from a train moving in the same direction, at a distance of at least one half mile, the flagman must immediately go back with a stop signal not less than 50 feet, and as much further as may be necessary to protect his train. But if the rear of his train cannot be plainly seen at a distance of at least one-half mile, the flagman must be governed by rule 99.

"When a train stops at a water or fuel station which is not a regular stopping place for that train, the flagman must be governed by rule 99."

Appellant also relies upon the following rules:

"Employees are warned that extra trains may run at any time, and trains may run on any track in either direction without notice, except to those whom it is necessary to advise in order to insure proper movements of such trains. Employees must be governed accordingly and exercise proper care to avoid being injured."

Rule B, page 7:

"Employees must be conversant with and obey the rules and special instructions."

Rule 105, page 50:

"Both conductors and enginemen are responsible for the safety of their trains and under conditions not provided for by the rules, must take every precaution for their protection."

Rule 85, page 35:

"If for any cause the speed of a train is so much reduced as to endanger the rear, the conductor will be responsible for fully protecting it by use of proper signals."

Our conception of the meaning of rule 99 does not make it applicable to the facts of this case, but this rule has application only to trains beyond yard limits, under quite different circumstances, and we think that the trial court was correct in so construing rule 99. It is the undoubted law of this state that railroads must make and promulgate such reasonable rules for the government of employees and the management and operation of trains, as will safeguard and protect the traveling public, the employees, and the property of both the company and of the shipper, and in failing so to do, are

liable for any injury or loss which results from or arises out of the confusion or want of unanimity occasioned by the lack of such rule, and it is and was the duty of employees, such as the plaintiff, Mitchell, to exercise the highest degree of care employed by experienced trainmen in such service, to conform to the said rules, and failing in this, an employee suffering an injury, is barred of recovery.

Appellant company complains that the court permitted the plaintiff, while testifying as a witness to give his construction and version of the several rules of the company, introduced by him in evidence, and it insists that the construction of such rules was not only inapt and at variance to the true intent thereof but a usurpation of the powers of the .trial court, upon whom alone devolved the power and duty of construing such writings; and further that the jury should not have been permitted to construe or pass upon the reasonableness of such rules.

In this it is correct, for this court in numerous opinions has held that it is the duty of the court to construe the written rules, as well as to say whether the conditions and circumstances shown in the evidence in a given case, justify the application of the rule in question, and in some instances to define the rules. L. & N. R. Co. v. Heinig's Admr., 162 Ky. 14; L. & N. v. Sewell, 142 Ky. 174; L. & N. R. Co. v. McCandless, 123 Ky. 125, and other cases.

We do not agree with learned counsel for appellant that the trial court, either allowed the plaintiff as a witness to construe the rules, or submitted to the jury that question. It is true, however, that the plaintiff, Mitchell, while testifying, was permitted to point out the application of certain rules, which needed explanation from persons familiar with them and engaged in the business they were intended to regulate. But since Mitchell, according to the evidence, is a man with twenty-three years of experience in railroad service, twelve years of which he has devoted to the work of conductor, his qualifications particularly fit him to speak upon the subject, and to point out the application which the rules were given in actual, every-day practice, by the company and its employees.

While the trial court did not admonish the jury with respect to the evidence applicable to the rules, or con-

strue the rules for the jury during the hearing of the evidence, it did so very fully and completely in the written instructions given the jury before argument was had. The jury was not called upon to construe the rules, but the court exercised this duty fully and clearly in the instructions, and in so doing was plainly within the rule announced by this court in the several cases cited above.

Appellant earnestly insists that the trial court should have sustained its motion for a directed verdict in its favor, upon the grounds that when the rules were properly construed and applied, there was no issue of fact to submit to the jury, but only a question of law for the court. With this view, we cannot agree. The plaintiff Mitchell's train was at a point on the track at which it had a right to be and was required to be in the performance of its duties. Working in the yards as it was, it had to move and give the right of way on the main track to passing trains, and this it was undertaking to do at the instant of the accident. While appellant company insists that the plaintiff, Mitchell, did not properly protect his train by a flagman or torpedoes, and that train No. 72 which ran into the caboose, was only traveling at a speed of from four to six miles per hour, the evidence for the plaintiff is quite at variance, and is sufficient to sustain the plaintiff's contention that he did properly protect his train, and that train No. 72 was running at a very much higher rate of speed than was allowed in the yards, under the rules. These are controverted points in the evidence of which the jury is the sole judge. When plaintiff started to move his work train from the main track to the siding, a place of safety, it was his duty, and a custom of the company in handling trains within its yards, to call in the flagman. Indeed, there would be no use in flagging for the protection of a train which had taken siding, and was not exposed to incoming trains. And, since the rule of the company requiring trains, such as train No. 72, while in the yard, and at a point where the view was obstructed, to run at a speed not exceeding six miles per hour, and the flagman, Larkin, had just returned from a point from which he could overlook the track for three-quarters of a mile, and no train was in sight, and the work train was moving at a rate or from four to six miles per hour onto the siding, a place of safety, we

fail to see wherein the plaintiff, Mitchell, failed to comply with the rules of the company for the protection of his train, or failed to exercise the degree of care required of a conductor under the circumstances of this case.

There was a question for the jury's determination. In fact, several questions, which the jury alone could determine, from the evidence. There was no rule of the company requiring a train in the yard, such as the one in charge of Mitchell, to flag against oncoming trains, but it was the duty of Mitchell, and other trainmen, to exercise the highest degree of care to fully protect trains. But whether in placing a flagman on the track to the south of his train, up to the time he started to move into the siding, was a compliance with the rules, or whether calling in the flagman as the train was moving into the siding, was a failure on the part of the plaintiff, Mitchell, to exercise the degree of care required, were questions of fact, for determination by the jury under proper instructions from the court. The plaintiff, Mitchell, had a right to rely upon the information obtained from the train dispatcher, as to the number of trains from the south, and the time of the arrival of the same. The dispatcher is the highest source of information on that subject. He has full charge of the schedule and no train can move without his order. It is argued that since train No. 72 had a regular schedule, but was late, and had not arrived, the rule of the company allowing twelve hours to delayed trains, had not elapsed since its scheduled time of arrival, and under said rule, train No. 72 had the right to proceed within the twelve hours, and should have been anticipated by the plaintiff, Mitchell. Moreover, the bulletin which the plaintiff, Mitchell, examined or had the opportunity and was in duty bound to examine, disclosed the fact that No. 72 was behind time and had not arrived, and put him on notice and it was his duty to take extra precaution to ascertain the time of arrival of the train No. 72, and failing in this he did not exercise the necessary care with reference to said train, when he made inquiry of the *train dispatcher* as to *what train would first arrive from the south,* if he did make such inquiry. Train No. 72 was from the south, and the question asked by the plaintiff, of the dispatcher, according to his evidence, was sufficient to elicit the information required.

If plaintiff asked the question: "What will be the first train from the south?" and the train dispatcher answered: "No. 42," and the scheduled time of arrival of No. 42 was 10:10 a. m., was it negligence on the part of the plaintiff to rely upon the statement of his superior officer? And if train No. 72 arrived unexpectedly to plaintiff and the accident happened before that hour, when plaintiff was acting upon that information and when he was complying with the rules, shall plaintiff's right of recovery be denied? We do not think it is necessary or even proper for a conductor to enter into a controversy or dispute with the train dispatcher, upon a point as to what train will arrive first, or the hour of arrival. The dispatcher had, at his disposal, the very best sources of information on that subject, and in fact directed and controlled the schedule, and the running of the trains. He was a superior officer in the service of the company to the plaintiff, Mitchell, and it seems to us that it was but natural and reasonable that the conductor should have accepted the statement of the train dispatcher as true and correct, and to have relied upon it. To hold otherwise would upset the whole system of train dispatching, render all schedules questionable, and put conductors in doubt, rendering disputes with the train dispatcher a necessary and common occurrence, with reference to the schedule of their trains. The confusion that would thus arise would be both unprofitable and dangerous. If the conductor had the right to rely upon the statement of the dispatcher as to the time of the arrival of train No. 72, and did so, and in doing so the collision happened, and he was injured at a time when he was exercising the degree of care required of him, and enforcing and living up to the rules of the company, employed for the protection of trains and trainmen, then undoubtedly the trial court committed no error in submitting the case to the jury.

The plaintiff made out a *prima facie* case when he proved the rule requiring trains entering the yard to be under control, and not to exceed six miles per hour, on an obstructed track. The violation of that rule by the crew of train No. 72, and the accident as the proximate result thereof, at a time when the plaintiff was conforming to the rules of the company for the protection of his train, entitled the case to go to the jury.

But it is urged that the evidence of appellant shows a different state of facts. There is a sharp conflict in the evidence on several points, but the rule adopted in this state, is to submit the case to the jury, where there is sufficient evidence to support the plaintiff's view of the case, even though the evidence for the defendant greatly preponderates. The weight to be given to evidence is for the jury, and the court has no power to disturb a verdict simply because it may believe a preponderance of the evidence is to the contrary, where the evidence is sufficient to support the verdict. The jury has the right, and is often justified, in finding the fact in favor of a single witness as against a great number on the other side. It is a question of veracity which addresses itself solely to the good common sense and discriminating intelligence of a jury.

The appellant company makes the point that the verdict for twenty thousand dollars is excessive. We have recited somewhat in detail the nature of the injuries received by Mitchell. The physicians do not all agree as to the permanent nature of plaintiff's injuries, but some regard them as only temporary in part, but the great weight of the evidence tends to support plaintiff's contention that his injuries are permanent. After the lapse of a year he is unable to perform any labor or even to feed or take care of himself. His power of mastication is almost entirely destroyed. He cannot follow his old occupation. At 46 years of age, it is too late in life for the plaintiff to take up a new calling, even if he were able physically so to do. He was earning from $145.00 to $150.00 per month. He can earn nothing now, but is a burden both to himself and family. From all the evidence we conclude his ability to earn money is practically destroyed. The pain and suffering which he has endured, no doubt, is beyond the power of words to express. While he is yet alive, can eat, drink, wear clothing, and require attention, he is dead so far as his capacity to earn money, provide for his family or enjoy the good things of life are concerned. In other words, he is an expense, but is unable to produce an income. Viewed from every side we are not prepared, although the verdict is large, to say that it is excessive, or that it appears to have been rendered under the influence of passion or prejudice.

Appellant cites three cases to support its contention that the verdict is excessive. L. & N. R. R. Co. v. Brown, 127 Ky. 732; L. & N. R. R. Co. v. Reaume, 128 Ky. 90; Ky. Wagon Mfg. Co. v. Shake, 137 Ky. 742.

In the Brown case relied upon, and above cited by the appellant, a verdict of $10,000.00 was awarded for injuries sustained in a collision on a railroad where Brown, an employee, was pinioned under some debris, resulting from a wreck, and held there for an hour or more in sight of fire which was burning the pile of stuff on him, when he was released. While he suffered some minor injuries to his person, and undoubtedly suffered great mental anguish, while unable to extricate himself from the burning heap, he was not seriously or permanently injured, but was soon able to return to work, and the court there properly adjudged a verdict of $10,000.00 excessive.

The case of Louisville & Nashville Railroad Company v. Reaume, was one where Miss Reaume, an actress, twenty-four years of age, was injured in a wreck from which she immediately proceeded on her journey to an engagement at a theater, on the same night, and took the part of the leading character, and performed her duties on that evening without apparent difficulty, either mental or physical, from the injuries received in the wreck. Shortly thereafter, she opened a school for the study of elocution and expression in Cincinnati and was able to earn good money. The verdict for $10,000.00 in that case was adjudged excessive because the injuries were slight.

Appellant also relies upon the case of the Kentucky Wagon Manufacturing Company v. Shake, 137 Ky. 742; where $10,000.00 was recovered for an injury sustained to the scalp of the head from which injury the complainant was confined to a hospital only five weeks, and was again able to perform his usual duties. There was no fracture of the skull or of the bones of the body, and while there was much physical suffering, it was slight compared with the injuries and suffering sustained in the case at bar, and the court there, properly held the verdict for $10,000.00 excessive.

The court, in the case at bar, gave eight instructions in all, the first six of which were offered by the plaintiff, and Nos. 7 and 8 were offered by and given at the instance of counsel for the defendant company. Appellant insists

that instruction No. 2 is in conflict with instructions 7 and 8. Instruction No. 2 is as follows:

"The court further instructs the jury that it was the duty of the plaintiff while using the track within the yard limits, to know what trains were expected and to use all possible precautions to protect his engine and cars. The court further instructs the jury that if they believe from the evidence that the plaintiff inquired of the train dispatcher on the morning before the injury, if any, as to what trains were expected from the direction of Winchester or the south, the plaintiff had a right to rely upon the information, if any, given to him by the train dispatcher, in the absence of any knowledge or information on his part to the contrary, and such inquiry and information, if any, obtained from the train dispatcher, was, in the absence of any knowledge or information of his own to the contrary, a discharge of his duty to know what trains were expected from the direction of Winchester or the south; and the court further instructs the jury that the rule or duty to use all possible precautions to protect his engine and cars, means all precautions which the jury may believe from the evidence were usual and customary under the circumstances on the part of (and which the jury may believe from the evidence might reasonably be expected to be used by) persons of ordinary prudence engaged in the same or like business and under the same or like circumstances and exercising the highest degree of care, and the highest degree of care means the utmost skill exercised by prudent and skillful persons in the management and operation of engines and cars."

The instruction informs the jury that it was the duty of the plaintiff to *know* what trains were expected at Paris on that day, and to use all possible precautions to protect against injury, and that if the jury believed from the evidence that the plaintiff inquired of the train dispatcher on that morning, before his injury, what trains were expected from the direction of Winchester or the south, that the plaintiff had the right to rely upon the information so acquired from the dispatcher in the absence of any knowledge or information on his part to the contrary; and that to obtain such information by inquiry of the train dispatcher, in the manner claimed by the plaintiff, was a discharge of his duty to *know* what trains were expected from the direction of

Winchester. The instruction further tells the jury what is meant by the rule which required of the plaintiff the use of all possible precautions to protect his engine and cars, and also the degree of care required of the plaintiff, and the definition of the highest degree of care.

We see no defect in instruction No. 2 that was prejudicial to appellant, but it must be admitted that in some particulars instructions Nos. 7 and 8, which are in substance the same, are in conflict with instruction No. 2; but since instruction No. 2 which was given on motion of the plaintiff is not erroneous, and since instructions 7 and 8 were prepared and offered by appellant, and given on its motion, it cannot be heard to complain that said instructions are in conflict with instruction No. 2, and thus take advantage of its own error. The instructions given by the court, omitting instructions Nos. 7 and 8, fairly present the law of the case, and are not subject to the criticism, made by appellant, that the construction of the rules of the company were submitted to the jury, nor are they conflicting. Quite the contrary is true. The instructions state clearly and concisely the construction to be placed upon the rules of the company, involved in this case. Instructions Nos. 7 and 8 are involved, and violate the rules against tautology, repetition, and circumlocution, but the appellant is not in position to take advantage of this.

Judgment affirmed.