## Duval et al. v. Duval et al.

(Decided April 18, 1932).

WOODS, STEWART, NICKELL & SMOOT for appellants.

DYSARD, TINSLEY & PRICHARD for appellees.

OPINION OF THE COURT BY CREAL, COMMISSIONER—
Affirming.

On October 28, 1929, a writing purporting to be the last will of Louis Duval was probated in the Boyd county court. By the terms thereof the executor was directed to sell the testator's property in Olive Hill, Ky., and to divide the proceeds equally among the four children of his first marriage, Charles F. Duval, August M. Duval, Anna Duval Walter, and Belle Duval Scott. After carrying out that devise and paying all debts, the residue of his estate was given to his second wife, Carrie E. Duval, for life, with the remainder to their only surviving child, Louis H. Duval, an imbecile, to be held for his use and benefit by a trustee. The Third National Bank of Ashland was appointed committee for Louis H. Duval and as executor with the will annexed.

The four children of decedent by his first marriage prosecuted an appeal from the county court's order of probate, and trial before a jury resulted in a verdict and judgment finding the writing in controversy not to be the last will and testament of Louis Duval. Carrie E. Duval, Louis H. Duval, and the Third National Bank, as administrator with the will annexed and also as committee for Louis H. Duval, are prosecuting this appeal.

As grounds for reversal, it is argued in brief for appellants that there was no evidence on which to base instructions on either mental incapacity or undue influence; that the verdict is flagrantly against the evidence; that propounders were entitled to a directed verdict; and that the court erred in not giving instructions A, B, and C, offered by the propounders.

The grounds argued necessarily call for a consideration of the evidence, but the number of witnesses and the length of the transcript forbid an attempt at anything more than a summary of facts shown by the proof.

Louis Duval, a native of France, emigrated to this country when a youth and first settled in Ohio, but later moved to Olive Hill, Ky., where for something like ten

years he followed his trade of blacksmithing and wagon making. After domestic troubles resulted in separation and divorce from his first wife, he settled at Ashland, Ky., and married appellant Carrie Duval. He opened a shop and continued to follow his trade assisted for a time by his sons. In 1892, he purchased a small hotel for $3,000, which he and his wife conducted until 1923, when the property was sold to the Chesapeake & Ohio Railway Company for $36,500. The net profit derived from the hotel was equally divided between Mr. and Mrs. Duval at the end of each week, and the proceeds of the sale to the railway company were divided in the same way. While the deed for the property was made to Louis Duval, Mrs. Duval testified that she paid the purchase price with money derived from the sale of a business which she owned in Cincinnati, but that Mr. Duval later paid to her one-half of the amount. However, there are no checks, receipts, bank records, or other records evidencing any of these transactions or payments. While the value of the property at Olive Hill cannot be determined with any degree of accuracy, it appears from the evidence that it was very small in comparison with the remainder of the estate, and that the devise to appellees was little if anything more than nominal.

The writing in question was signed by Louis Duval on July 30, 1925, and was witnessed by Mr. and Mrs. J. R. Simpson. Mr. Simpson testified that Mr. and Mrs. Duval came to his home in the evening, and Mr. Duval told him he wanted him to witness his will and handed the paper to him; that he read the will to Mrs. Simpson, and it was then signed by Mr. Duval in their presence, and they signed it as witnesses. There is no evidence whatever as to when, where, by whom, or under what circumstances the paper was prepared, although it was typewritten and appears to have been drafted by one well versed in such matters.

For appellees, it is shown that, while the Duvals and Simpsons lived in the same community and had known each other for years, their business and social relations were not particularly intimate and that Mr. and Mrs. Duval had never called together at the Simpson home prior to the time the will was executed; in fact, there is little evidence of visiting between these families.

Belle Duval Scott did not testify on the trial, and there is little in the record to indicate when and under what circumstances she left the home of her father. The other three appellees did testify, and their evidence as well as the evidence of neighbors tends to establish that Mrs. Duval was, from the beginning, hostile to them, and that she set about and did cause them to leave their father's home, and that she persistently contrived to prevent them from visiting, seeing, or even corresponding with him. Some of the children testified that when they would call at his home they would be met by the stepmother, who would tell them their father was out; that she told them, in substance, that their father did not care to see them. There is evidence that, when Anna Duval Walter was about 17, her stepmother sent her to Cincinnati to secure employment, but supplied her with but 50 cents in addition to her railroad fare. Prior to this time Anna had worked as a maid at the hotel, but another was secured to take her place. One neighbor testified that one of the sons when turned away from his father's door would come to his home and await an opportunity to see his father when he came out of the house. It is further in evidence that some of the children were actually required to pay board when visiting their father at the hotel. When Mr. Duval died, Mrs. Duval struck the names of appellees from the funeral notice to be published in a local paper and failed to notify them of his death. There is also evidence that Mrs. Duval told others that appellees were dead.

There is evidence tending to establish that Mrs. Duval was a strong-willed person, and that she dominated and controlled her husband in all business transactions. As one of the witnesses expressed it, "She had what she wanted, and had what she wanted done the way she wanted it done." Another witness said, "I noticed that she had everything to say and everything to do and he was perfectly dumb, as the saying is, when she was present."

Mrs. Layne, one of the near neighbors of the Duvals, testified that Mrs. Duval transacted all the business for many years before her husband's death; that he minded her like a child, and only said what she permitted him to say. Mrs. Layne also testified that she rented from them and that Mrs. Duval asked that the

190

rent be paid to her because her husband was not capable of taking care of it, that Mrs. Duval told her she kept Mr. Duval upstairs because of his mental condition, and that she had instructed him that no matter how many times the doorbell or telephone rung not to answer it. She further testified that in the spring of 1924, after the hotel property had been sold, Mrs. Duval stated that she had taken a portion and bought the property where they lived for her son, Louis, and intended to see that she and Louis got the other half because she disliked the stepchildren and did not want them to have anything; that in 1926, when Mr. Layne was very ill, Mrs. Duval asked her if she had everything fixed so all the property would be hers in the event he died, and when she replied that she had given the matter no thought, Mrs. Duval said: "Well I told you I was going to get things fixed, and I had things fixed. I got everything fixed like I want it." She testified that in 1924 Mr. Duval came to do some work on the steps to the property where she lived, and she told him he was not able to do the work, and he replied: "Oh she thinks I can do it. Money, money, money is all she thinks about. She and Louis want it all but you know I have children of my own that I must take care of."

On the question of mental incapacity, it is shown by a number of witnesses for appellees that for many years prior to his death Mr. Duval had been a constant drinker of alcoholic liquor, and there is much evidence to indicate that he often drank to the extent of intoxication. There is also evidence that for many years prior to his death he was afflicted with a severe bladder infection and prostate trouble which necessitated constant catheterization.

Dr. Goodman testified that he treated Mr. Duval in 1928, and that the patient gave him a history of his long-standing prostate trouble and also stated that he had been given to the use of intoxicants all his life. Mr. Duval was 83 years of age when the paper offered as a will was executed. Dr. Goodman as well as other physicians testified that bladder and prostate trouble affected the normal functioning of the natural organs, poisoning the system, and having a bad effect on the mind. They also testified that the constant and excessive use of alcoholic liquors tended to impair the mind and especially so with the very old; that medical

authorities teach that excessive use of alcohol tends to impair and deaden the finer sensibilities and moral fiber and lowers the powers of resistance to such an extent that the subject is susceptible to the control, influence, and power of others. When asked for an opinion based on the condition of Mr. Duval when he treated him and the history of the case as given him, whether in 1925 he had mind sufficient to make testamentary disposition of his property, Dr. Goodman testified that, not, having known Mr. Duval at the time, he would be unable to state positively, but that from his lowered resistance and from his age it would be more than likely that he did not have such mental capacity. Dr. M. D. Garred, in answer to a hypothetical question based on a history of Mr. Duval's case, gave as his opinion that in 1925 he would not have been capable of handling his business affairs. Dr. Garred was called in consultation with Dr. Goodman when he treated Mr. Duval in 1928, and his evidence with respect to bladder and prostrate trouble and the use of alcoholic liquors was practically the same as that of Dr. Goodman.

A number of lay witnesses who were acquainted with Mr. Duval were asked the usual questions concerning his capacity to make testamentary disposition of his property, and gave as their opinion that he did not have sufficient mental capacity to make a will; however, the facts related by some as forming a basis for their opinions are rather trivial in nature, yet some did give substantial reasons on which to base such opinion.

Against the evidence introduced to sustain appellees' theory of mental incapacity and undue influence, it may be said, without going into detail, that appellants offered much evidence of a substantial character denoting that Mr. Duval was a man of unusual physical and mental strength and vigor, inclined to be self-willed, determined in purpose and action, and not of a character or disposition to be dominated, controlled, or unduly influenced by others. His accumulations are the fruit of a life of industry, thrift, and the exercise of sound business judgment in the management of his affairs. Aside from the evidence of prostatic trouble in the latter years of his life, there is no proof of disease or infirmity calculated to impair his powers of mind or body. In fact it may be said that the evidence preponderates to show that, notwithstanding his advancing

years and the physical infirmity which had overtaken him at the time he signed the paper in controversy, his mental faculties were not impaired to any appreciable extent, and that he did have those qualities of mind and memory recognized by law as sufficient to dispose of his property by will. A number of lay witnesses who knew him intimately testified that he did have such mental capacity, and recited substantial reasons for that opinion. Medical experts who had treated and observed him gave as their opinion that he had mental capacity sufficient to make testamentary disposition of his property at the time the paper was signed. There is also evidence tending to repel the charge of undue influence exerted upon Mr. Duval by his wife to procure him to make a will.

Under section 4850, Kentucky Statutes, the verdict of a jury in a will case is governed by the same rules that apply to the verdict of a jury in other civil cases; therefore we are to determine by standards already fixed whether in this instance the evidence was sufficient to take the case to the jury and to support its verdict. Measured by rules laid down in Langford's Ex'r et al. v. Miles et al., 189 Ky. 515, 225 S. W. 246, and cases therein cited, it will be seen from the foregoing recital of the substance of the evidence that there is proof of substantial and relevant consequences to sustain the grounds of attack upon the will. Therefore the court did not err in refusing to peremptorily instruct the jury to find the paper in question to be the last will and testament of decedent.

While as indicated in the Langford Case, juries should not be permitted to set aside a will upon mere remote and speculative evidence having little if any probative force, because the terms of the instrument may not be in accord with their ideas of propriety and equality, it is equally true that this court is not authorized to substitute its judgment for that of the jury where there is evidence of a substantial and probative nature to support the verdict.

Many of the isolated incidents detailed by witnesses to show undue influence, standing alone, would appear to be trivial and of no consequence, yet, when these fragments are examined and each considered in its relation to the entire record, they become significant. The difficulty of establishing undue influence by evidence of

expressed declarations and overt acts has long been a subject of comment in this court. Sheeran v. Jarboe, 190 Ky. 840, 229 S. W. 111; Livering v. Russell, 100 S. W. 840, 30 Ky. Law Rep. 1185; Henson v. Jones, 247 Ky. 466, 57 S. W. (2d) 498. The very purpose for which such influence is exerted would be frustrated if it were permitted to work openly, and, since it is usually exerted by studied artifice, sly ingenuity, and cunning, resort must often be had to circumstantial rather than direct proof. McConnell's Ex'r v. McConnell, 138 Ky. 783, 129 S. W. 106; Meuth's Ex'x v. Meuth, 157 Ky. 784, 164 S. W. 63; Rhea v. Madison, 151 Ky. 262, 151 S. W. 667; Walls v. Walls, 99 S. W. 969, 30 Ky. Law Rep. 948.

There is evidence to indicate that at the very outset the idea of alienating her husband from the children of his first marriage was conceived by Mrs. Duval, and in a comparatively short time she had accomplished that design. There is also evidence that she dominated her husband in business transactions. She not only reaped one-half of the profit from the venture in the hotel business and in the sale of the property, but, according to the evidence of Mrs. Layne, who appears to have been an intimate friend, she confided to her a purpose to have Mr. Duval dispose of his property as she desired, and later told her that she had things fixed like she wanted them. From these and other fragments of evidence, the absence of evidence as to the preparation of the paper, the circumstances attending its execution, and many other facts and circumstances, the jury must have concluded that the paper offered for probate was the will of Mrs. Duval rather than that of her husband. In arriving at their verdict, the jury had the right to and no doubt did take into consideration the age of Mr. Duval, and evidence as to the enfeeblement and impairment of his mind and powers of resistance by disease and the excessive use of alcohol. In seeing and hearing the parties and witnesses testify, the jury had better opportunity to determine the weight to be given their evidence than can the court from a reading of the record. Many things appear in a trial to lend color and weight to the evidence which do not appear in the record.

Viewing the record as a whole, it is manifest that

there is substantial evidence to support the verdict and in the circumstances this court is not authorized to interfere although on the same proof its finding might have been different. Green v. May, 148 Ky. 783, 147 S. W. 428; Cincinnati, N. O. & T. P. Ry. Co. v. Goode, 169 Ky. 102, 183 S. W. 264; Louisville & N. Ry. Co. v. Mitchell, 173 Ky. 622, 191 S. W. 465; City of Newport v. Schmit, 191 Ky. 585, 231 S. W. 54.

The court gave instructions in the usual form which have often been approved by the court, and these fairly and properly submitted the issues to the jury. As to the insistence that the court erred in not giving instruction A, B, and C, offered by the propounders, it may be said that any theory of the case embodied in instructions B and C is included in instructions given by the court. Instruction A relates to the right of the widow to renounce the will of her husband and to take under the statute of descent and distribution. Counsel for appellants content themselves with the mere statement that this instruction should have been given. They neither make argument nor cite authorities in support of their position, and we take this to be at least a tacit concession that there is little, if any, merit in this ground.

Judgment affirmed.