## Loving's Adm'r et al. v. Williamson.

(Decided May 6, 1938.)

BELL & LOGAN and B. S. HUNTSMAN for appellants.
MILLIKEN & MILLIKEN for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

The matter presented by this appeal involves a will contest between Mrs. Williamson, formerly Miss Loving, and her brother, Will Loving, only children of Mrs. Ida M. Loving, who died in Warren county April 18, 1936.

On April 27, 1936, a paper, purporting to be the last will of testatrix, was admitted to probate. Appellee alleges that under the terms of the instrument her brother was devised the bulk of the estate, consisting principally of real property, and she was indirectly bequeathed $100 in cash; George Williamson, a grand-

son, was given one diamond earring, Bill Loving, a great-grandson, two small diamonds, and J. W. Loving, Jr., grandson, one diamond earring and all household and kitchen furniture.

It was alleged that the document was not the last will of deceased because "at the time of execution thereof, April 6, 1936, and for some time prior thereto," testatrix was not of sound mind and memory, and by reason of age and protracted illness was mentally incompetent. The exercise of undue influence by and on the part of the son was likewise charged.

Copy of the will is filed with the petition, and upon inspection it shows the above devises and bequests, and further provides that the son was to pay all just debts and the funeral expenses of deceased, and $100 to the daughter. The son was willed any property which "I may inherit from Lucy B. Poynter, of Louisville, Kentucky." Appellant was named executor without bond.

An answer was filed by appellant controverting the allegations of the petition. Proof was heard and the issue submitted to a jury, upon instructions not questioned. Ten of the twelve jurymen signed a verdict finding against the will. On this verdict judgment was entered and from this judgment the son appeals, presenting solely the contentions that the court erred in overruling the motion for a directed verdict, and that the verdict was flagrantly contrary to the evidence.

At the outset we may say, after a careful reading of the evidence, there is no doubt that the court correctly overruled the motion for a directed verdict, since it is clear that the evidence, though in parts conflicting, was amply sufficient to authorize the court's ruling in this respect.

We shall state what we conceive to be some undisputed facts. Testatrix died on April 18, 1936, being then about seventy-one years of age. Up until the disease with which she was afflicted developed to a critical stage, she had apparently been a very active woman. That she was a good Christian woman there can be little doubt, nor any that she was equally fond of both children.

More than eighteen years prior to her death testatrix and her daughter moved to the Mansard Hotel in Bowling Green, then owned and operated by George M.

Williamson, who later married the daughter. Testatrix was employed at the hotel as buyer, and custodian of the stockroom. She lived at the hotel some time after the marriage of her daughter, and later bought a house near the hotel. At the time of her death she was the owner of two pieces of real estate, one located on Center street, the other on Thirteenth.

There is little satisfactory proof as to the values of these properties, but it may be gathered from the evidence that the difference in value ranged from $250 to $500. The Center street property was estimated to be worth $4,000 and the other $3,500. Testatrix at her death owed about $1,500.

In November, 1935, testatrix had written a will in her own hand. Some time in February, 1936, and before her last illness, she gave this to Mrs. Larmon, who lived in the same house with testatrix, to type for her. This Mrs. Larmon did, and dated it as of the date of the will written by testatrix; she and her husband witnessing the will. This witness testified that she distinctly remembered that the original will (which she had copied verbatim) devised to the daughter the house and lot on Center street, and to the son a life estate in the Thirteenth street property, with remainder to his son. She left her household furnishing to a grandson, Will Loving, Jr. She requested that the daughter and son would each leave, or give, Dr. Comfort of the Gospel Mission, $250, and made other immaterial bequests or directions. The matters contained in the will were discussed freely by testatrix and witness; the reasons she gave the respective properties to the one or the other, and in particular in regard to giving a life estate in the house devised to her son, she said was because she wanted the grandson protected and was afraid that "in some way it would get out of the father's hands."

This will was placed in Mrs. Larmon's hands for safekeeping, and she held it until about March 22, and, having no safe place to keep it, she returned it to Mrs. Loving, explaining to her the reason. Testatrix insisted that witness keep it, but, after some persuasion, testatrix was induced to keep it, seeming to be satisfied with it.

This witness says that she took the will to Mrs. Loving three times before she could find her in such mental condition that she could explain why she was

bringing it back. She saw Mrs. Loving twice after the return of the will, and she says she was not conscious of what she was doing. The second time she neither spoke nor opened her eyes, and was administered a hypodermic while witness was present. This witness lived in the same house with Mrs. Loving until about March 5, and she expresses the opinion, from her observation, her association and dealings with her, that at that time she was mentally incapable of executing a will, though admitting that some checks shown here were signed by testatrix after the date mentioned.

At this point we shall review the proof as to the physical condition of Mrs. Loving some years prior and up to the time of her death. Dr .Blackburn examined testatrix in the summer of 1932, and in August of that year performed an operation for cancer of the breast. He saw her no more until October, 1935, when he discovered that the glands in the neck had become involved. He deemed further operation inadvisable, and suggested X-ray treatments, and later testatrix went to the Mayo Hospital for such treatment. Dr. Blackburn heard the testimony of Dr. Graves, which will be referred to later, and, basing his opinion on his knowledge of the case and Dr. Graves' testimony, he questioned her mental capacity to make a will. Taking her condition as described by Dr. Graves up to March 28, he said that on April 6, her condition would necessarily be worse, because of the poison from the cancer affecting "the whole organism, the spinal cord and the brain; and cholratone was being administered, which in addition to relieving nausea had a sleep-producing or hypnotic effect. With that state of affairs, when she died on April 18, I would question very materially whether she had mental capacity on the 6th, twelve days prior to that, to know what she was doing." This lapse of mentality the doctor attributed to the ravage of the disease and the treatment.

Dr. Graves began visiting testatrix on February 6. He saw and treated her on an average of about every four or five days until March 28, skipping then until April 12, visiting her, with the exception of two days, up until her death. Testatrix was suffering from a "metastasis in the lymph glands of the neck, as the result of a cancer of the breast. * * * The cancer had spread to various parts of the body. * * * It had involved the spinal cord and some of the nerve roots;

\* \* \* she was suffering to such extent that she was possibly taking dilaudid every four to six hours.'' The drug is a form of morphine to relieve pain. ''She was also taking cholratone to relieve nausea.'' On April 12 she had to be aroused when the doctor appeared, and she did not recognize him, though he says she seemed to recognize the nurse. The doctor had not seen the patient since March 28. She was not in a stupor, ''but a little bit irrational. You could talk to her, and after a while she would get the meaning of what you were saying, but was pretty hard to focus her attention on what you were talking about.'' The doctor seriously doubted that on April 6 or on March 28 testatrix was mentally capable of executing a will. On redirect examination the doctor said he was out of the city from March 28 to April 12, ''part of the time,'' but had instructed the nurse that whenever the patient was in pain to administer the opiate. He said there was a progressive decline, more perceptible during the last three or four weeks of her life.

Coming now to the execution of the will in question, appellant, whose place of business was near the home, says that on the morning of April 6 the cook came to his place and told him his mother desired to see him. He went over in a few minutes, and testatrix said she wanted to make a will. He suggested an attorney, one who had theretofore attended to some business for testatrix, and appellant called him, advising him of his mother's wishes, and the attorney said, ''Well, I would have to bring my stenographer down there and dictate it, and then rewrite it and bring it back down there.'' Appellant says he went back and told his mother what had been said and she agreed and told him how the will should be made, and he made notes of it; making the notations as testatrix had told him, put them in his pocket and went back to work, and later took the notes to the attorney's office. The stenographer took the notes dictated by the attorney and transcribed them.

In the afternoon the will was taken to Mrs. Loving's room. There were present when the will was executed the attorney, his secretary, the nurse, and appellant. The will was witnessed by the attorney and his secretary, both of whom testified. It was stated by both that Mrs. Loving was told that the will had been written from the memorandum furnished. The will was read to her, she having him repeat one portion in re-

gard to the bequest to the grandson of the household and kitchen furniture, and testatrix said, "Well, that's like I wanted it." After the will was read to her, testatrix read it and said, "It's all right," and signed it and at suggestion wrote her name across the back of the sealed envelope in which the will was placed, the attorney taking it to his office where he kept it until after the death of testatrix. It was testified that testatrix took an envelope from a book or ledger, tore it up, and told the nurse to burn it, which the nurse said she did. The secretary said that Mrs. Loving had the book, and the paper which was torn up, under her pillow. The attorney gave it as his opinion that at the time the will was executed Mrs. Loving knew what she was doing. The secretary was not questioned on this point.

The daughter testifies that on April 6 she was at the home, and the mother was in no condition to hold conversation with any one. That on the 8th she went into a coma, and could hardly be aroused at all. She sent for the daughter, but when she arrived testatrix was unable to explain why she had done so, or what she desired.

Mrs. Miller, a lady of about the same age as testatrix, and a close friend and coworker in religious work, states that she had seen Mrs. Loving frequently, about every week prior to her death; that two weeks before her death Mrs. Loving knew nothing; was unconscious for a great part of the time, and not able to transact any sort of business. At times she did not recognize her friend. She thought her mental impairment was due more to her physical condition rather than age.

Miss Norton, another close friend, saw Mrs. Loving about two weeks before the will in question was executed. She did not talk in her natural voice; she had the appearance of one under the influence of opiates, or mentally wrong. She was easily excited, weak and nervous. She was in no condition at that time to transact any business. A sister of testatrix saw her about a month before the will was executed. "She was taking something to ease her pain all the time and wasn't conscious long at a time. She knew what she was talking about at times, and sometimes she did not; at times she talked silly." This witness had received a postal card from testatrix about March 26, which she said was written by her sister, and was a sensible document. It

is shown that testatrix was unconscious on Sunday, five or six days after the will was written, and gradually grew worse until she died on the 18th. There was other testimony to the same effect.

On the other hand, the nurse who attended Mrs. Loving in her last days, the cook who had been with her for many years, two persons who lived in the same apartment for some time, all describe Mrs. Loving's condition, and say that she was mentally capable of making a will, even up to the time of its date. Two of her relatives visited testatrix the day after the will was made, and they say that on the occasion she was cheerful and "seemed to be all right." She told them (Mrs. Martin and daughter) that she had made a will the day before, and told them she had left the son practically all she had, and had left Mrs. Williamson $100. She mentioned other bequests, and said she had a little pair of diamond earrings that she wanted Mrs. Sams (the nurse) to have, provided she wanted them; if not, they were to be given to Will Loving's grandson, a matter that is not mentioned in the will or elsewhere. She expressed her reason for giving the son the major portion of the property, because "he needed it, and she didn't think Mrs. Williamson did." These witnesses noted nothing wrong with testatrix mentally. One of these witnesses also says testatrix told her before the last will was made that she was going to make her will. Witnesses admitted that they had not seen testatrix for some years before the occasion mentioned above. They describe testatrix as being a woman of strong will. There is also other testimony of the same tenor.

One witness who lived in the same house with testatrix, testifying that she was capable, said that at times she was under the influence of opiates. Her husband had gone to her room and administered opiates up until the last illness. She said that when testatrix came out from under the influence of opiates, "she would just talk; she wouldn't know what she was talking about. It was just at random. But other than that I never did see her when she was out of her head. After she would get to talking she would be all right."

The cook's testimony tends to show that shortly prior to the time the will was written there was a possible misunderstanding between the daughter and mother. Witness says the daughter took some scarfs

from a dresser, and some spoons. She ordered some work to be done on the porch, which work annoyed the testatrix. The taking of the articles did not appear to worry testatrix a great deal. It developed that the scarfs had been taken for laundering. The spoons were taken for safekeeping. They were returned upon request. The porch was in a bad condition and was partially repaired without much noise. Witness says when testatrix was "mighty sick one morning," she asked her to call her daughter to come down, which she did. The daughter was with the mother all day of April 18, the day of her death. This witness says that the son came to see his mother oftener than the daughter— sometimes when she went after him, and at other times, which differs in some respects to other testimony on the same point, but she makes it plain that testatrix "thought a lot of both of her children." As to her condition, physically and mentally, the last two or three weeks of her life, witness said: "She was sick, but she couldn't help being worried; she was mighty sick all right, but she wasn't out of her head."

The nurse testified that for several days prior to April 6 testatrix had wanted to do some writing, and "I didn't think she was hardly well enough. I thought she would get her strength you know." This kept up for several days and finally "I said to her, 'Mrs. Loving, why don't you have some one to do the writing for you?' and she says, 'Well, I will' and she called the cook and sent her over for the son. He came over and when I came in he was writing something off, I don't know what." The son left and later came back with the attorney. She says she had never heard the son "solicit" his mother to make a will in his favor; never heard any discussion of it. Mrs. Williamson came every day while the nurse was there. The son did not come so often, but she says that this was because of a "No Visitors" sign on the door. He came more frequently after it was explained that this did not apply to members of the family. This witness thought testatrix was competent to make her will on April 6. The daughter was in the home the next day and no mention was made of the occurrences of the day before. This witness was not in the room when the son was making the notes. She could hear talking, but could not hear what was said.

The daughter says that shortly before the will

was written she learned that the brother had given Mr. Williamson a check for $100 and had been offering to pay other of his mother's bills. She admits that she told Loving, Jr.'s, wife that it might be that her brother needed the income more than she did, "but I did not mean that we did not need the property." She says she felt that, if the will had been changed, the brother would get all the property, and the grandson and she would "suffer the same fate." She says that while her mother had frequently and freely discussed the November will with her, she had never mentioned the April 6 will, which she never learned of until she read about it in a newspaper.

What we have detailed so far relates more directly to the condition of testatrix physically and mentally, and not, except by indirection, to any charge of undue influence. In fact, there is little direct proof of any undue influence, though the opportunity for the exercise of same may appear from the proof to have been at its best about the time the will was written. There is proof that testatrix had been a woman of strong will, just how strong that will was during the last days of suffering, and under intermittent administration of opiates, is a matter of conjecture.

It is pointed out by appellee that the proof shows, and it does, that it was the frequently expressed purpose of testatrix for several years before her death to leave the Center street property to Mrs. Williamson, and the other house to appellant for life, with remainder to the son. It is shown that Mr. Williamson owned property on each side of the Center street property, which testatrix had bought at a time when Mr. Williamson was a prospective purchaser, and forewent the purchase when he learned that testatrix wanted it. Mrs. Loving knew that her daughter owned no property in her own name; that while her husband had a rather large gross income, his net income was not so large. She had worried somewhat about some part of his business her son was engaged in (operating slot machines and selling beer), and was fearful that he would waste his property. She had expressed a fixed purpose to will the remainder to the grandson. In writing her former will she had not contemplated that she might inherit something from her sister, Mrs. Poynter. In her last will she willed to the son "any property that I may inherit from Lucy B. Poynter of Louisville, Ky." She

had directed the chief devisees of the first will to give to the Gospel Mission, of Dr. Comfort, $500. She made no direct provision for payment of her debts.

It appears from the testimony that appellant knew the terms and conditions of the first or former will. No witness is produced who mentions the fact that the second will was ever discussed with any persons, save, perhaps, the two relatives above mentioned.

It is apparent from a review of the testimony that up to a brief period prior to the making of the will, followed shortly by her death, testatrix had manifested on many occasions a fixed purpose, and this was to treat alike as nearly as possible the two children in the disposition of the property.

It may be that this theretofore fixed purpose was suddenly changed, just prior to April 6, because of the slight rift between the mother and daughter, which, as we have said from the proof, did not cause testatrix a great deal of worry. It may be argued that this slight change of feeling opened the way for the exercise, by slight effort, of an undue influence.

However, disregarding for the moment the question of undue influence, and looking alone to the testimony with relation to the physical condition of testatrix due to the ravage of the disease with which she was afflicted, and the mental condition due to the administration of the pain-relieving drugs, we think that on this phase of the case alone there was sufficient evidence to support the verdict of the jury.

The evidence adduced upon what we conceive to be the main point, incapacity, was, as is not unusual in such cases, conflicting. As we have observed, there was ample evidence to take the case to the jury, as measured by the rules of this court. Duval v. Duval, 249 Ky. 186, 60 S. W. (2d) 351; Langford's Ex'r v. Miles, 189 Ky. 515, 225 Ky. 246. This being true, it is not difficult to go a step further and conclude that there was sufficient evidence to support the jury's verdict.

As we indicated in the Duval and Langford Cases, supra, juries should not be permitted to hold null a will upon remote or speculative evidence having little or no probative value, because the terms of the instrument may not accord with its ideas of what the will should have been; it is just as true that this court is not au-

thorized to substitute its judgment for that of a jury's, provided always that there be sufficient evidence of substantial and probative quality as to authorize its finding. In other words, we do not disregard the jury's verdict, unless it at once strikes us as being flagrantly contrary to the evidence.

Looking to the whole record without pointing it out more specifically, or in a manner other than we have undertaken in the foregoing recitals, it is manifest that there was evidence of a substantial nature to support the verdict, hence we must follow the established rule and not disturb same. Duval v. Duval, supra, and cases cited on this point.

Judgment affirmed.