### Rhea, et al. v. Madison, et al.

(Decided December 17, 1912.)

#### Appeal from Edmonson Circuit Court.

1. Wills—Contest Over Will—Undue Influence—Evidence.—Upon an appeal from a judgment against a will, a reversal is sought upon

the ground that the verdict of the jury finding against the will is flagrantly against the evidence, and because of the admission of incompetent evidence. Held, There is no meritorious ground upon which a reversal can be based. Under the evidence the jury was authorized to find the will in contest the result of undue influence exercised by testator's wife and that it was not the product of his free and unbiased mind.

2. Wills—Undue Influence—Evidence—How Estate Accumulated—It was not improper to permit contestees to show that the bulk of testator's estate was accumulated during the life of a former wife to whose efforts and good management, more than to anything else, he was indebted for the fortune that he had at the time he married appellant.

3. As to the question of admission of incompetent evidence, it is in rare instances only that undue influence can be established by direct evidence, and the evidence complained of which went to establish the exercise of undue influence was not incompetent.

GRIDER & LOGAN and GRIDER & HARLIN for appellants.

SIMS & RODES and LOGAN & HAZELIP for appellees.

OPINION OF THE COURT BY JUDGE LASSING—Affirming.

This is a contest over the will of W. T. Rhea. The will was executed on July 1, 1909. The testator died in October, 1911. By the will in question, he devised to Mrs. Tamer Hester, Mrs. Minnie Madison and Mrs. Lena Hudson, daughters by former marriages, the sum of $100 each. After the payment of his debts and the payment of the special bequests to his daughters, he gave all his personal property to his wife, Eliza B. Rhea. His farm he gave to his wife for life, with remainder to his only son, W. Taylor Rhea, Jr. He further provided that in the event his wife, Eliza B. Rhea, did not survive him, the farm should go to his infant son, W. Taylor Rhea, Jr., in fee simple, and that all his personal property, after the payment of his debts, should be equally divided among his four children. The contestants are the three daughters, who attacked the will on the ground of undue influence exercised over the testator by his wife, Eliza B. Rhea. The contestees are Eliza B. Rhea and the infant, W. Taylor Rhea, Jr. The jury found against the will. Judgment was entered accordingly, and the contestees appeal.

The testator was married three times. By his first wife he had two children, Mrs. Tamer Hester and Mrs.

Minnie Madison. His first wife did not live very long. After the death of his first wife he married Jane Merideth, who lived for a number of years and bore him one daughter, the contestant, Lena Hudson. The testator's second wife died in March, 1905. In the month of June following, the testator married appellant, Eliza B. Rhea. During the following year William Taylor Rhea was born. The will in question was executed about two years and three months before the testator's death. During the latter part of June, 1909, the testator was a juryman, and in attendance on the Circuit Court at Brownsville. While there he approached John A. Logan, an attorney, and requested him to write the will. Mr. Logan prepared the will in accordance with the testator's directions. On July 1, 1909, the testator came to the bank at Rocky Hill and requested L. U. Cornelius and W. W. Saunders to witness the will. The testator signed the will in their presence, and they in his presence and in the presence of each other, attested it. The will was then turned over to Mr. Cornelius, the cashier of the bank. Mr. Cornelius placed it in an envelope, sealed it up and put it in a vault of the bank, where it remained until after the testator's death.

On the trial the will was produced and its execution proven by Messrs. Cornelius and Saunders. After describing the manner of its execution, Mr. Cornelius says that the testator's mind at that time was perfectly clear, and he had never known it to be otherwise. Mr. Saunders, after testifying to the execution of the will and its attestation by him and Mr. Cornelius, stated on cross-examination that he had three conversations with the testator with reference to his property; one about a year before the will was made, one about six weeks before he died and one the night he died. In the first conversation the testator stated that he wanted to lay up $100 a year for his wife and child, so if anything happened to him they would have that much advantage over the others. In the second conversation he stated that he was going to try to make money enough to pay the girls their part, and let the boy have the farm. On the night he died he called the witness to his bed. He stated to witness that he had sold some cattle and wanted the witness to look after them. He also said that his papers were in the bank, and he wanted witness to see that "Sis" (the name he usually applied to his wife) and his boy got their part. This witness was permitted, over

the objection of appellants, to say that Jane, his second wife, had made all he had; that upon going home after her death, he found $150 that she had saved after buying the groceries, and which he did not know that she had. Witness also stated that Mrs. Rhea had told him that Mr. Rhea had burned up his former will. Witness also testified that Mr. Rhea had $1,000 on time deposit in the bank, and one day he asked the witness to place half of it to the credit of his wife. Witness also stated that for a short time after his third marriage testator did not attend church regularly. Later on he became a regular attendant, and seemed to enjoy religion more than he ever did.

J. S. East testified that the testator told him that he intended to put $1,500 in the bank so his wife could pay off the other heirs. Testator also said that he wanted his boy to have the farm.

For the contestants the evidence is as follows:

Mrs. Hudson testified that she and her husband, at the time her father married the third time, had her father's farm rented for the rest of the year. About two months after the marriage she and her husband moved out of her father's home and moved into another place on the land. There was never any trouble between her and her father, and her father always treated her in a way that showed that he loved her. She says, however, that they moved out of her father's house because they became dissatisfied. The reason for the dissatisfaction was that things after the marriage did not go on as they had done before. She and her husband would do the cooking, and her father and stepmother took the meat away from them. Witness knew nothing of the will in question, and also stated on examination that her relations with her father and stepmother were always friendly. Her father would frequently visit her, and he and her stepmother would often come together. Witness also visited her father and stepmother.

Mrs. Madison testified that she lived near Smith's Grove and on a farm adjoining her father. There was never anything wrong between her and her father. On the contrary, he always acted in a way to indicate that he loved her. Witness frequently visited her father and stepmother, and they in turn visited her. Witness was permitted, over the objection of appellants, to say that she remembered hearing her father say that he had received about $800 from witness' mother, who was her

father's second wife. Witness also testified that she was 31 years of age and had three boys and one girl.

Nathan Merideth testified that testator's farm was worth about $12,000, and that his personal property was worth about $4,000. He said that the testator was a member of the Baptist Church, and attended regularly before his last marriage. After that time he stopped for a while. Witness had a talk with him, and later on Mr. Rhea became a regular attendant. This witness also stated that he considered Mr. Rhea, the testator, a man who could be easily influenced. He said that he had persuaded him to come back to church, and it had taken him a long time to do so.

Belle Parish, a negro woman, who did washing and ironing, testified that she sometimes worked for Mr. Rhea's last wife. On one occasion Mrs. Rhea told her that she thought he (Mr. Rhea) ought to leave the property to her and her child, as the other children had men to support them. Mrs. Rhea said that Mr. Rhea did not want to do that, and she said she thought he ought to leave the property to her and her child. Mrs. Rhea further said if he didn't want her to have the property, she would feel like going home. This conversation took place about three years before the witness testified.

John Whittle testified that on one occasion he had a conversation with testator, who said that he was going to put $100 a year in the bank to his wife's credit until he got $1,000, so that his wife might have it to raise the boy on if anything should happen to him. He said he meant for all his children to share equally, but he wanted to give his wife and last child that much over the others. In answer to a question as to whether or not Mr. Rhea was a man who was easily influenced by his friends or those close to him, witness said: "I think Mr. Rhea was a mighty fine man, but if you come at him right you could handle Mr. Rhea most any way."

W. C. Caffee testified that he had three different conversations with the testator. He told him on each occasion that he wanted to make enough money to put $100 in the bank each year for his wife to raise the boy on. In answer to a question as to whether or not Mr. Rhea was a man who could be easily influenced by those who were close to him, witness said: "I have always thought that particular friends could influence him. I have heard him say he would not do things, and go ahead and do them. I have seen him get aggravated about church

matters, and say he wouldn't do things, and then I have seen him turn around and do them." Witness also stated that there was a period of time after testator's marriage that he did not attend church as regularly as he did before. On cross-examination witness stated that testator said that he wanted his boy to have the land, and that the testator told him that his boy's name was William Taylor Rhea, Jr.

John Rhea testified that the testator told him that he never would have been worth anything if it had not been for Jane, his second wife. Witness also stated that he thought a man that Mr. Rhea liked could persuade him to do most anything. Witness also said: "I believe I could have persuaded him to have loaned me money." Witness also stated that he himself was easily influenced by his friends.

Porter Compton testified that the wire fence running from the chicken house to the spring on the testator's place was built two or three years before he testified. He also said that anybody that the testator thought a right smart of might influence him. Witness further stated that he guessed that he himself could be influenced by persons that he liked.

Mart Whittle testified as follows:

"I went over there one day to buy some 'ingerns.' I did not raise them. I could buy them cheaper. We went to see each other often, good neighbors and good friends, and we were out there in the 'ingern' patch, and I leaned up against the fence to talk a while, and he said, 'my wife had been fretting at me, and fretting at me to get me to make a will,' and he said, 'I finally said to her, I will make it your way.' And he said he did make it her way and took it and said: 'Thar it is,' but he said, 'I am going to tear it up; I want my children to share equal.' I said, 'Yes, Taylor, I would tear it up, that is her will; and I would make one of my own, and I would put it in the bank and say nothing to her about it.' He said: 'My first children are as good as my last, and I want them to share equal.' "

Witness, in answer to the question, "Did he (testator) have an apple at that time?" said: "Well, yes. I said: 'Taylor, sometimes I go home and I have an apple in my pocket, and I have four children, and when I get home I take my knife and cut the apple in four pieces and give each one a piece. I want them all equal.' And he laughed and said: 'That is right.' I said to him

that I had some children that didn't do as I would have them do. I had a boy that drinks.——" (Objected to by attorney for defendant.)

By the court: "Is he telling a part of the conversation he had with Mr. Rhea? If so, it is competent."

Witness was then told to go ahead. He said: "It is not necessary to tell what I said about my boy. There is no need to tell about that." On cross examination witness said he could not tell when it was that he went over there to buy onions. On being asked if it was before Mr. Rhea married the last time, he said: "I just don't know. I don't recollect. I paid no attention." Further on he said it had not been four years. He fixed the occasion as the one on which Henry Hudson built the wire fence from the hen house to the spring. This witness was subsequently recalled for the purpose of laying the ground for contradiction. He was asked if he had not told a man by the name of Ferguson that the conversation that he had with Mr. Rhea occurred six or seven years ago, and during the lifetime of the second wife. Witness said: "I might have told him before thinking. If I did, it was unthoughted. I didn't pay much attention."

For the contestees, Mrs. Eliza B. Rhea testified that she was married to W. T. Rhea in June, 1905. At that time she lived close to his farm at Rocky Hill. She called her husband "Papa," and he called her "Sis." After she moved to her husband's place, Mr. and Mrs. Hudson moved out of the house to another house on the place. Her relations with her husband's daughters were always friendly and cordial. They frequently exchanged visits. The first time Mr. Rhea spoke to her about making a will was in the month of June, 1909. He came home from Brownville and told her that he had had his will written. He told her that he was going to leave the will in the bank. He went over in a day or two and told her that he had left it at the bank after he had signed it. Her husband said that he had raised all the others until they were grown, and he wanted Willie to have the farm. She stated that the wire fence that Mart Whittle referred to was built during the lifetime of the testator's second wife. Mart Whittle was there one day and sat out in the yard, but not by the fence. She never had any conversation with the negro named Belle Parish, in reference to her husband's property. After she married her husband, he showed her a former will which

he had made. He said, "I will burn it up. It is no good, and when I know how, I will make another." She never told him to burn it up. On cross-examination, witness stated that she was 47, and the record showed that her husband was 64 at the time of his death. Over the objection of defendants, she testified that the first time her husband called, he told her his business. This was on Wednesday. She told him she would think it over and pray over it. He came for his answer on Sunday. She got word on Thursday that he wanted to come to see her, and he came the following Wednesday. They were married the following Thursday. All this evidence was objected to. Witness, also, over the objection of appellants, stated that Mary Merideth had told her that Mr. Rhea would make a new will; that he had made a will to his last wife, and would make another. It was some time after their marriage before he showed her the will that he had made during the life of his second wife. She thinks that he read it to her. After she and her husband were married he never missed but one church meeting, and she never tried to keep him away from church. When she married her husband she had only a yearling and a hog and her clothes and bed clothes. Mary Merideth said he had made a will, and would make a will to the woman he married. When her husband made the will in controversy he brought it home. It was not then signed. He told her what was in it. Then he read it to her. Her husband then took it to Rocky Hill and told her that he had signed it up and left it at the bank. Her husband told her that he wanted to save $1,500 and put it in the bank so as to pay off any debts he had, and have enough left to run the farm.

John A. Logan testified that he drew the will in question. The testator was on the jury at the time, and came to witness in Rocky Hill. Testator was anxious to have the matter fixed right, and told witness to be careful. Witness was a stranger to the family and had never done any business for the testator before. He did not know the name of a single child. The testator told him how he wanted the will written, and he wrote it exactly as testator directed. At the time the will was written the testator was in perfect health, his mind was good and he talked intelligently. Mr. Rhea was not present at the time the will was written. On cross-examination witness stated that Mr. Rhea was very cautious, and particular that no one should know that he

had made a will. He asked witness if it was necessary
for the witnesses to read the will, and witness told him
it was not. He told the witness to keep the matter pri-
vate, and not let anyone know about the terms of the
will.

J. W. Stice testified that the testator told him he
wanted his son to have the farm, because he had his
name, and wanted the business run in his name, just
as he had run it. Mrs. Caffee testified that the testator
said to her that he wanted the farm for Willie. W. F.
Murphy testified that one month before the testator
died he had a conversation with him, and his little boy
was present at the time. Testator told witness that the
boy's name was W. T., Jr., and that after he was dead
he wanted his business to go on in the same name. Al
Whittle, a neighbor, 80 years of age, testified that he
had a talk with the testator, in which the testator said
that he had willed his farm to his son, and he wanted
to put $1,500 in the bank to his wife's credit so she would
have something to run on. Testator said that he wanted
his wife to have the land during her life, and at her
death he wanted it to go to the boy. He further said
that Mrs. Rhea thought a heap of Mr. Rhea, and he
thought a heap of her. Mr. Rhea was honest and just
so far as he knew. Irvin Stice testified that he heard
the testator tell his father that he wanted the boy to
have the farm; that he did not know what might become
of the boy. Daniel Keith testified that about a year and
two months before the testator died the testator told
him that he had willed his property to his wife and little
boy, and W. R. Slaughter testified that he and testator
were down at Brownsville in June, almost two years
before he testified, and the testator said that he aimed
for his wife and baby boy to have what he had.

A reversal is sought upon two grounds: First, be-
cause the verdict of the jury finding against the will is
flagrantly against the evidence and not sustained by
sufficient evidence; and second, because the court erred
in permitting incompetent evidence to go to the jury.

We will consider these objections in their inverse
order. The record shows that the court, in the conduct
of the trial, permitted the evidence to take a range cov-
ering practically the married life of appellant with the
testator. Indeed, some of the witnesses testified to facts
and circumstances leading up to their marriage. None
of this evidence, however, can properly be objected to.

The ground upon which the contest was based was undue influence, and it was sought by the contestants to show that from a period prior to the date of appellant's marriage with testator, she had conceived the idea of acquiring all of his property. With this end in view, they introduced evidence to the effect that appellant was advised, shortly before her marriage to testator, that whoever became his wife would get his property. It is in rare instances only that undue influence can be established by direct evidence. Its existence is shown usually by the grouping of certain facts and circumstances together; and this frequently necessitates the introduction of evidence covering practically the married life of the parties concerned. It involves the introduction of conversations with the wife and with the testator, and, when such conversations have a bearing upon the question at issue and tend, in any wise, to support or establish the claim that undue influence has been exercised, it is but proper that the jury should have the benefit of the entire conversation. When viewed in this light it is apparent that the evidence complained of, as to the conversation between the testator and his friend, Mart Whittle, was competent. Nor was it improper for the court to permit the contestants to show that the bulk of the testator's estate was accumulated during the life of his second wife, and that he recognized that, to her efforts and good management more than anything else, he was indebted for the fortune which he had at the time he married appellant. He had reared a daughter by this second wife, and by the will in contest he had practically disinherited her, and it was not improper for her to show that, practically the entire estate of her father, in which she was denied the right to participate, was brought to him or saved through the efforts of her mother. Nor can appellant complain that appellees called upon her to show what property she had at the time she married their father. The relation of the parties and their circumstances in life may always be shown; but, if it should be held that the court erred in requiring appellant to testify as to what property she had at the time she married the testator, we are of opinion that it was not prejudicial, on the contrary, it would rather be in her favor, for, if it created any impression at all on the minds of the jury, it would be calculated to excite their sympathy instead of their prejudice against her.

We find no error in the admission or rejection of evidence of which appellant can complain.

This brings up to the complaint that the verdict is not supported by sufficient evidence. It is conceded by counsel for appellant, in their brief, that the evidence of Mart Whittle and Belle Parish has a direct bearing upon the question of undue influence, and that because of this evidence the trial court necessarily had to submit the case to the jury. No complaint is made of the instructions as given, so that, unless it can be said that the verdict is flagrantly against the evidence, we would be unauthorized in setting it aside. It is shown by the testimony of many witnesses that the relation between the testator, appellant and his three children by his former wives was entirely friendly. They lived in the same neighborhood. So far as the record shows there never was the slightest jar or difference among them. He was undoubtedly very devoted to the child of his old age, who bore his name; and it is in evidence that he said to several of his friends that he wanted this boy to have the farm. He likewise said to several of his friends that he was laying aside money annually for the purpose of educating this boy and of making provision for him. Indeed, at one time he placed in the bank to the credit of his wife $500, and said, when doing so, that he wanted to enable appellant to take care of the boy. While there is much evidence going to show that the will, in contest, was the free and voluntary act of the testator, there is also evidence to the effect that it was not the character of will which he desired to make. There is evidence from which it could reasonably be inferred that it was the result of a determination on the part of his wife, appellant, to deprive his children by his former marriages, of any participation in his estate. When the circumstances, under which the will was drawn, are read in the light of the information that was conveyed to appellant just before she married the testator, it is not difficult to understand what she meant, when she said to her servant, Belle Parish, some time after her child was born, that she thought he (referring to her husband) ought to leave the property to her and her child, and if he did not want her to have the property she would feel like going home. But, if the meaning of this conversation with the servant could not be seen to have any direct bearing on the question of undue influence on the part of the wife, in the draft of the will in con-

test, when it is read in connection with the testimony of Mart Whittle as to what the testator said to him, the force and effect of this statement, on the part of appellant, is clearly brought out. He says that the testator said to him: "My wife has been fretting at me, and fretting at me to make a will," and that he finally yielded and told her that he would do so, and that, in obedience to that promise, he caused the will to be made as it was, took it home to her and told her, "Thar it is," and that thereafter he caused it to be executed and left at the bank. It is a singular circumstance that, although the testator caused this will to be drawn by a lawyer who lived several miles from his home, he did not execute it until he had taken it home, exhibited it to his wife and knew that she was satisfied with it. It is also a singular coincidence that the will, as drawn, disposed of his property in exactly the way in which his wife said to the servant, Belle Parish, that he should dispose of it. It is argued that there is no direct evidence showing that appellant ever requested her husband to make a will of any character. It is true, there is no direct evidence, but this testimony of the servant as to how appellant said it should be made, when read in connection with that of Mart Whittle that the testator told him how it came to be made, if true, is even more convincing; for it shows that appellant, while endeavoring to have a will drawn so as to give her and her son all of the property, was at the same time trying to proceed in such a way as to avoid detection. If these witnesses are to be believed, their evidence shows that she determined to have the property willed to her and her son in the way and manner in which it was and that she kept at her husband until he complied with her request. Whether she went so far as to advise him that, if her wish was not complied with, she would leave him, the evidence does not show. If the servant's evidence is true, there is no doubt that she would have pressed her claim to that extent, had it become necessary. All the testimony shows that he loved all of his children equally well, and wanted to treat them all alike. Under the circumstances we are not prepared to say that the jury was not warranted in finding that the paper in contest was the result of an undue influence and was not the product of the free and unbiased mind of the testator. No satisfactory explanation was offered by appellant for the unreasonable and unnatural act of the testator,

in attempting practically to disinherit the appellees. All of the evidence shows that he loved them. They lived near him; were constantly associated with him. Aside from the statement of the witnesses that he visited them and they visited him frequently, we have his expressed desire to treat them all alike in the distribution of his estate. Why, then, did he fail to do so? No satisfactory answer is given. The only explanation whatever offered is that to be found in the testimony of the servant, Belle Parish, coupled with that of the witness, Mart Whittle, and the jury was warranted in accepting their statements as true. If so, the testator was undoubtedly influenced by his wife to give to her and her son his property to the exclusion of his daughters, who were equally dear to him and for whom he desired to make the same provision.

After a careful consideration of the record, we fail to find any meritorious ground upon which a reversal should be based. The judgment is, therefore, affirmed.