ANTONIO PARADIS ET AL. APPELLANTS FROM DECREE
OF JUDGE OF PROBATE IN RE WILL OF
NARCISSE PARADIS

Kennebec.    Opinion, March 31, 1952.

348

*McLean, Southard & Hunt*, for plaintiff.

*Goodspeed & Goodspeed*, for defendant.

SITTING: MURCHIE, C. J., THAXTER, FELLOWS, MERRILL, NULTY, WILLIAMSON, JJ.

MURCHIE, C. J.   The appellants in this case are Antonio Paradis and Jeanne Theriault, two of four children disinherited by a will leaving all the property of their father to his wife, if she survived him, and to a half-brother of theirs, if she did not.   They seek a review of a decree of the Supreme Court of Probate, and the findings therein, made by the justice who heard their appeal from the Probate Court, without the intervention of a jury.   Their exceptions allege error in the decree and in rulings on evidence.   The justice denied their appeal, allowed the contested instrument as the last will and testament of Narcisse Paradis, and made specific findings that he was of sound mind when it was executed, and was not subjected to duress or undue influence in the making of it.

The testator, who was married twice, died December 24, 1948, survived by a widow, his second wife, and five children, two borne by her and three by the first wife.   His will, executed February 28, 1948, recites expressly that he is not

unmindful of the four disinherited children, naming all of them. The wife made a will at the same time, leaving all her property to him, if he survived her, and if not, to her son Joseph. Joseph was the contingent beneficiary under both wills.

The record presented does not contain all the testimony taken out in the Supreme Court of Probate. It presents the testimony of two of the subscribing witnesses to the will, and a stipulation that the third "need not be personally called," to lay the foundation for the first exception, and that of two witnesses called by the appellants. The Bill of Exceptions quotes some evidence in addition, part of which relates to the second exception and part to the third, in connection with which it carries the full testimony of two additional witnesses called by the appellants. We shall take the exceptions up in order.

## THE FIRST EXCEPTION

The stipulation aforesaid recites that the witness whose personal appearance was waived by it would testify, if present, that she was a stenographer in the office of the scrivener of the will at the time it was executed, and was one of the witnesses thereto, that the testator was a stranger to her, and said no more in her presence than to answer "Yes" when the will, as drafted, was presented to him, and he was asked if it was his last will and if he desired that it be witnessed. She would testify, also, it declares, that the testator, his wife, and the subscribing witnesses were together in the scrivener's office while all the signatures appearing on the document were affixed thereto, that the testator signed it in the presence of the witnesses, and that they signed it in his presence, and in the presence of the others. The case does not disclose whether the same witnesses subscribed the will of the wife.

The testimony of the scrivener, who was one of the witnesses to the will, relates the circumstances attendant upon

the preparation and execution of it, and his long acquaintance with the testator, and carries his declaration of opinion that the testator was "sane" at the time. That of the third witness to the will (second in order of signing) covers less than three pages in the record. She, also, was a stenographer in the office of the scrivener. Her evidence confirms the recitals of the stipulation, and the testimony of the scrivener, concerning the manner in which the will was executed. She was not asked to give her opinion whether the testator was of sound mind, either by the proponents or the appellants, but admitted, in effect, on cross-examination, that she had declared in the Probate Court, at the first hearing on the will, that she did not hear the testator say enough to permit her to form any opinion as to his mental capacity.

This exception is grounded in the fact that the stipulation, and the evidence of the third witness, particularly as given, according to her admission, in Probate Court, establish conclusively that two of the three subscribing witnesses to the will gave no thought when signing it to whether the testator was "of sound mind," to use the words of our statute of wills, R. S., 1944, Chap. 155, Sec. 1. The exception is a dual one, alleging errors (1) in the refusal of appellants' motion that the will be disallowed, made at the close of proponents' direct case, and (2) in the decision carried in the decree, that the requirements of the statute were satisfied, despite omission of the witnesses to form an opinion that the testator possessed a "sound mind."

The claim of the appellants cannot be said to be entirely without foundation in precedent. In New York one ancient case, at least, may be said to support it. It was so construed, in any event, by Judge Redfield, an eminent writer on the law of wills. The case, *Scribner* v. *Crane*, 2 Paige Ch. 147, 21 Am. Dec. 81, was decided in 1830. It involved an instrument purporting to be the will of a very feeble lady, nearly ninety years of age, who, while lying on her

bed helpless, had placed her mark on a document drawn by her physician, with a hand guided by him. He subscribed it thereafter, as a witness, as did two other persons, who testified, when it was offered for probate, that they had "relied partially, if not entirely, on the declarations" of the physician as to the capacity of the testatrix. The will was disallowed because neither of these two witnesses "had sufficient knowledge on the subject to give legal evidence of the due execution of the will." Judge Redfield included this case in his collection of leading cases on the law of wills, American Cases on Wills, 137, attesting to the distinction of the author of the opinion, Chancellor Walworth, and subscribing to the desirability of a more stringent rule about the proper function of witnesses to wills than that generally recognized. It is his comment, thereafter, however, which bears directly on the present case. This reads as follows:

> "We do not expect to be able to restore the office of the attestation of the subscribing witnesses to a will to its former healthy state. The law, upon all questions, must conform in some degree to existing usage and custom, however unwise we may deem it. And the fact that most men execute their wills in the most informal manner, away from their dwellings, in the offices of attorneys, calling the first persons they can find to witness them, must in a great degree deprive the attestation of all judicial character. Formerly, wills were prepared with great care, by giving formal instructions to solicitors, and designating the persons who were to act as witnesses, some near friends more commonly, and always such as were well acquainted with the testator and his family. The actual execution of one's will under such circumstances, became a very solemn act, somewhat in the nature of a religious rite, like a baptism or burial. It was then very proper to regard the formal attestation by the witnesses as a sort of judicial authentication, much like probate in common form. At that time a witness who attested the execution of a will, and then testified to the incompetency of

the testator, was regarded much in the light of a perjured person. But now this is every day's occurrence, without exciting any surprise or rebuke. We can not but feel that the old practice was the better one; but we do not well see how it is to be restored, except by statute, and statutes are not so likely to be enacted in order to revive obsolete usages as to inaugurate new ones."

The appellants do not cite *Scribner* v. *Crane, supra,* but they do cite an Annotation in 35 A. L. R., noted hereafter, which identifies it, several decisions of this court, some Massachusetts cases and one from Illinois, and quote excerpts from several of them to sustain their position that witnesses to wills must form opinions about the soundness of mind, or otherwise, of those executing them. *Gerrish* v. *Nason,* 22 Me. 438, 39 Am. Dec. 589; *McKeen* v. *Frost,* 46 Me. 239; *Robinson* v. *Adams,* 62 Me. 369, 16 Am. Rep. 473; *Trinitarian Congregational Church and Society of Castine, Appellant,* 91 Me. 416, 40 A. 325; *Wells, Appellant,* 96 Me. 161, 51 A. 868; *Martin, Appellant,* 133 Me. 422, 179 A. 655; *Chase* v. *Lincoln,* 3 Mass. 236; *Brooks* v. *Barrett,* 7 Pick. 94; *Hastings* v. *Rider,* 99 Mass. 622; *Nunn* v. *Ehlert,* 218 Mass. 471, 106 N. E. 163, L. R. A. 1915 B 87; and *Allison* v. *Allison,* 46 Ill. 61, 92 Am. Dec. 237.

The quoted excerpts have a tendency, without doubt, to confirm the claim of the appellants that the purpose underlying the requirement that wills be executed in the presence of credible witnesses is to have reliable evidence of the execution of them, and provide security against fraud. Many of the cases suggest the desirability of honest and unbiased opinions from such a source, concerning the soundness of the mind of a testator. None, however, except *Allison* v. *Allison, supra,* rejected a will because one or more of the witnesses formed no judgment on that question at the time it was executed, and that decision is explained by the court's declaration therein that the Illinois statute required "before

a will can be admitted to probate, that the subscribing witnesses shall swear they believe the testator to have been of sound mind and memory."

It is not difficult to find statements in judicial opinions which, without reference to their context or the issues under consideration, lend color of support to implied principles of law the cases cannot be considered as having declared. In *Robinson* v. *Adams, supra,* for example, which the appellants cite as declaring that sanity on the part of the testator is one of the things a witness must be qualified to attest at "the time of the act," i.e., the signing, Judge Kent, after quoting Greenleaf on Evidence in its statement that:

> "Witnesses to a will are permitted to testify as to the opinions which they formed of testator's capacity, at the time of executing his will",

declared expressly that such witnesses might express such opinions although they were suddenly called in "and heard only the request to sign and the declaration" that the paper they were asked to sign was a will. This was in 1870. At a later date, 1902, Judge Powers, in *Wells, Appellant, supra,* dealing with a case in which two of the witnesses to a will had expressed no opinion about the soundness of mind of the testatrix, and the third, a nurse who had been in attendance on her throughout the day the will was executed, had testified that she was out of her mind all that day, set aside a jury verdict that the testatrix was not of sound mind, with express declaration that it is not necessary, to establish a will:

> "that any of the subscribing witnesses should testify to the sanity of the testator."

Finally, in 1920, in *Goodridge, Appellant,* 119 Me. 371, 111 A. 425, this court, in dismissing an appeal from the allowance of a will, where the issues were due execution, fraud and undue influence, noted that one of the subscribing wit-

nesses had not recalled the execution of the will until "after his memory was refreshed," and that the others had no recollection whatsoever "of what occurred at the time of their attestation," but had merely identified their signatures. The true function of witnesses to wills is to prove due execution, and that is done by the identification of the signatures of the testator and themselves. *Canada's Appeal*, 47 Conn. 450.

In the Annotation aforesaid, 35 A. L. R. 79, and in the text of American Jurisprudence, 57 Am. Jur. 232, Sec. 302, the rule is asserted to be, "with rare exceptions," that it is the duty of a subscribing witness to a will "to observe and judge of the mental capacity of the testator." Both the Annotation and the text recognize, however, as the latter states expressly in the paragraph following that wherein the quoted words appear, that:

> "the rule that an attesting witness is under a duty to observe the mental capacity of the testator is, in some respects, honored more in the breach than in the observance, since courts which uphold it do not carry it to the extent of invalidating a will for the reason that the attesting witnesses did not perform the duty imposed by the rule."

The proper function of witnesses, asked to attest wills, is well stated in the opinion of Mr. Justice Wilde, in *Hawes* v. *Humphrey*, 9 Pick. 350, 20 Am. Dec. 481. Therein, after asserting that the statutory requirement that wills be witnessed was intended to protect a testator, who might be *in extremis*, or greatly debilitated by age or infirmity, from fraudulent practices, and made them, in some sense, the judges of sanity, he said that:

> "It is their duty to inquire into this matter, and if they think the testator not capable, they should remonstrate and refuse their attestation."

The appellants do not assert that the evidence presented in the Supreme Court of Probate could not support a find-

ing that Narcisse Paradis was of "sound mind." They admit that it could. They declare, expressly, in their Bill of Exceptions, that:

"While there was conflicting evidence, want of mental capacity is not raised in these exceptions."

It was the right and privilege of the appellants to have each of the subscribing witnesses to the will express an opinion whether the testator was of sound mind at the time of its execution, and to develop facts to show the opportunity, or lack of opportunity, each had for forming a considered opinion on the subject. They elected not to do this, but to rely entirely on the technical question of law they have raised. We have considered it at length, notwithstanding it might have been dismissed rather summarily on the express authority of *Wells, Appellant*, and in accordance with the plain implication of *Goodridge, Appellant*, both *supra*, because we deem it desirable to make it entirely clear that no will should be disallowed in this state on the ground asserted. Our statute gives persons of sound mind the right to dispose of property by will upon complying with stated formal requirements. It may be to the advantage of those seeking to exercise the privilege that they select witnesses who will be able to vouch for their capacity, but capacity is a question of fact to be resolved on the evidence presented. It is not an issue to be decided on such a technical ground as that some particular person or persons, even those selected as witnesses to attest execution, formed no opinion on it. The first exception is overruled.

## THE SECOND EXCEPTION

This exception challenges rulings barring the appellants from proving what they had earned during the years 1921 to 1941, during minority and thereafter, what substantial amounts of their earnings they had turned over to their father, to help him in maintaining his home, and what

"understanding," if any, they had with him concerning such contributions, presumably in connection with how he should dispose of any property he might possess at the time of his death by will. They assert that they were prepared to show, also, the comparative earnings of the father, in the years 1921 to 1946, inclusive. It is in evidence that he suffered a shock, at an unstated time, and it may be, although the point is not covered in the testimony of the witnesses whose evidence is before us, that this occurred in 1946, and terminated his earning capacity.

The evidence excluded might have had a tendency, if coupled with information disclosing the size of the estate of the testator, which is not disclosed by the record, to show that he died possessing more property than he would have had if the contributions sought to be proved had not passed into his hands, and the principle that, under appropriate circumstances, the source of the property of a testator may be proved, when the question of undue influence is in issue, has been recognized in many cases. As it is stated in Corpus Juris, 68 C. J. 772, Sec. 460:

> "Evidence tending to show the source of the property is admissible to sustain the reasonableness or unreasonableness of the will, particularly where the testator was under an obligation to the person from whom the property was derived to make a certain disposition of the property."

Reference to the cases cited in support of this textual statement, however, discloses that the circumstances held applicable have always been far different from any which might have been disclosed by responsive answers to the questions to which the rulings challenged relate. These, as set forth in the Bill of Exceptions, were:

"Q When did you start work?

Q How long did you continue to work while living at home?

Q  While you were working what part of what
you did earn did you turn in to your father?

Q  Did you continue to work and turn in money
at home after you were 21?

Q  Did you have any talk after you became 21
with your father about simply paying board?

Q  Roughly how much had you contributed during
the time you had been working?"

They were asked of Antonio Paradis when he was giving his testimony, and were excluded on objection, and the Bill of Exceptions states that similar, if not identical, questions were asked of Jeanne Theriault, with the same rulings. The issue as to whether the rulings were proper was raised by exceptions noted and preserved, but the circumstances are not comparable to those presented in the cases cited in Corpus Juris to support the textual statement quoted: *Glover* v. *Hayden,* 4 Cush. 580; *In re Ruffino's Estate,* 116 Cal. 304, 48 Pac. 127; and *Rhea* v. *Madison,* 151 Ky. 262, 151 S. W. 667. Neither is there anything in additional cases cited by the appellants which relates to contributions made by children to a parent for the maintenance of a home, while residing in it with him, particularly when it is noted that some part of the discussion between parent and child in this case, after the latter became of age, was "about simply paying board." We cannot recognize that any child may restrict the right of a parent to dispose of his property by will in such manner as he may wish by contributing to the maintenance of a home, during minority or thereafter.

The claim of the appellants, apparently, is not that the contributions in question restricted the free will of their father, but that the facts that they were made, and that the son who was named as the contingent beneficiary in the will made no corresponding ones, tended to support their claim that the father was subjected to undue influence, exercised by that son or by his mother. The assertion was made in

argument by the appellants that it was admitted that Joseph, the contingent beneficiary, made no contributions prior to the execution of the wills. This may have been said on the authority of the testimony of the scrivener, that the testator told him, when the will was prepared, that Joseph had made no contributions "except as payments on the building might mean that." If it has any additional support in the evidence, it must appear in the testimony of some witness whose evidence is not presented in the limited record carried by the Bill of Exceptions. The reference to "payments on the building" is to the fact that the testator told the scrivener that he and his wife had borrowed money on a mortgage a short time before the will was made, and that Joseph "was paying on the buildings."

In considering this exception, we are hampered by the fact that the record is incomplete. We are unable to say, with no knowledge of what testimony was given by Antonio Paradis and Jeanne Theriault, or by other witnesses, whether the testimony excluded would have any bearing on the issue of undue influence. The scrivener testified that the testator went into some detail in discussing his children, asserting:

"something to the effect that the children were all pretty well off, or getting along all right",

and noting that one daughter was a nun, saying that he:

"was kind of proud of that."

In further support of this exception, the appellants cite us to an additional statement in the section of Corpus Juris already cited, that:

"In passing on the questions of fraud, mistake, and undue influence, it is proper to consider the nature and contents of * * * the will itself. * * * to compare provisions * * * with other evidence to determine whether they are unjust, unequal, or un-

> . natural, as such inequality or unnaturalness * * *
> bears on the question of fraud and undue influence,
> although it is insufficient in itself to establish such
> matters, and hence is immaterial and incompetent
> in the entire absence of other evidence",

and to the Case Note accompanying the report of *Meier* v.
*Buchter*, 197 Mo. 68, 94 S. W. 883, 6 L. R. A. N. S. 202, in
the last cited report thereof, as well as other authorities, in-
cluding 57 Am. Jur. 291, Par. 407, an extended annotation
in 66 A. L. R. commencing at Page 228, with special ref-
erence to Page 250, and several decided cases from other
jurisdictions, dealing with distributions of property by will
held to be unjust, unnatural, unreasonable, or capricious.
It is said in the Case Note aforesaid that:

> "The authorities are all agreed that an unnatural
> distribution of property by the testator may be
> considered in connection with other facts going to
> show undue influence".

The case annotated quotes 29 Am. & Eng. Enc. Law, Second
Edition as saying, at Pages 115 and 116, that:

> "Evidence that the provisions of a will are un-
> reasonable, unjust, capricious, and unnatural is
> not sufficient in itself to establish undue influence
> * * *; but it is proper to be considered along with
> other evidence as going to show such undue influ-
> ence * * *. And for the purpose of setting out
> more clearly the unnaturalness of the will, it may
> be shown that relations between the testator and
> the relatives not provided for were pleasant, or
> that the latter were dependent for support on the
> former."

All these authorities recognize that undue influence cannot
be proved by reference to the will and its provisions alone.
Corpus Juris makes that point directly, asserting that it is
"immaterial and incompetent in the entire absence of other
evidence." The Case Note declares that it may be con-
sidered "with other facts," and the Encyclopedia suggests

the nature of such facts in its reference to relatives not provided for being "dependent for support" on the testator. Regardless of such limitations, the subject matter under discussion in all instances is a will carrying an unnatural or unreasonable distribution, and it cannot be said that any man possessing a small property is providing for such a distribution in making a will leaving his entire estate to his wife. We have no knowledge about the size of the estate here involved, but it is difficult to believe that it could be a large one if, as the excluded evidence was apparently designed to prove, the children of a first wife were making contributions to the maintenance of a home, after a stepmother appeared on the scene and increased the family group by two children borne to the father by her. As the record stands, the possibility that there might be such supporting evidence as dependency, noted in the Encyclopedia, is eliminated by the testimony of the scrivener that the testator asserted to him that the children he was disinheriting were "pretty well off" or "getting along all right."

One thing about the will of Narcisse Paradis is apparent on its face, the inequality of his provisions for his several children. On this point it may be sufficient to refer to the one case cited in Corpus Juris to support its textual statement about unjust and unequal provisions of wills. That case is *Storer* v. *Zimmerman*, 28 Minn. 9, 8 N. W. 827, where it is said:

> "mere inequality, however great, in the distribution of * property among children * * is no evidence of undue influence * * *. If it were evidence from which a jury might find undue influence to avoid the will, the issue practically presented * * * in every case * * * would be, is the will such as the jury, if in the testator's circumstances, would have made? Few wills could stand if such were the test."

The second exception must be overruled. The limited record before us cannot justify the belief that responsive

answers to the questions involved would have brought the case within the principle stated in Corpus Juris concerning proof of the source of testator's title to the property he possessed at the time of death and make the distribution he attempted to provide for by will unjust, unnatural or unreasonable in any way, and the inequality in his treatment of his children is amply explained by his own references to their situation at the time the will was made. To hark back to the quotation from Am. & Eng. Enc. Law, carried in *Meier* v. *Buchter, supra,* there is no evidence in the limited record before us concerning the relations between the testator and the disinherited children when the will was made, and no suggestion of any dependency of any of them upon him for support.

## THE THIRD EXCEPTION

This exception, like the others, alleges more than one erroneous ruling, challenging not only those which refused to permit the appellants (1) to cross-examine a witness they had called to the stand, on the ground that she was hostile and adverse, and was giving testimony which was a surprise to them, (2) to prove that she had declared the factual recitals carried in a statement prepared by their counsel and signed by her, identified as Exhibit 2, were true, and (3) to introduce that Exhibit in evidence, but additional rulings so interrelated with those three that they require no separate consideration.

The witness was Mrs. Evelyn Paradis, the wife of the contingent beneficiary. She had testified in opposition to the allowance of the will in the Probate Court, had signed Exhibit 2 when it was presented to her for that purpose by appellants' counsel, and has asserted to them, in the presence of other witnesses, that the factual recitals carried in it were true, after the opening of the case in the Supreme Court of Probate. She had indicated at that time, however,

that she did not wish to testify again, and had stated that she would be out of town when the case was heard, if she knew when it was to be. There can be no doubt the appellants and their counsel knew that her attitude was both hostile and adverse when they called her to the stand, as was made entirely clear by counsel's statement to the court:

> "Sometimes you have to call hostile witnesses, Your Honor. The law recognizes the fact the purpose of a law suit is to get out the truth. If this woman can contribute to the truth and the facts in this case she ought to be permitted to testify. They won't put her on, we know, and the only alternative is for us to put her on although we know she is hostile."

Recitals in the Bill of Exceptions disclose that the procedure appellants sought to follow was to compel this witness, through a cross-examination conducted by reference to Exhibit 2, to affirm the truth of its factual declarations, or impeach her, if she did not make the affirmations, by the testimony of witnesses asserting that they had heard her declare them to be true. It ought not to require the citation of any authority to demonstrate that such a plan of procedure has no support in legal precedent. All the evidence presented in litigated cases must be sworn testimony, and must be so presented as to give the parties to whom it is adverse the opportunity for cross-examination. Facts cannot be proved in court by having a witness, or a multiplicity of witnesses, make oath that some named person said at some time or times that the recitals of a written document were true. Parties may be permitted, it is true, under appropriate circumstances, to cross-examine witnesses they have placed on the stand, *State* v. *Benner*, 64 Me. 267, *State* v. *Crooker*, 123 Me. 310, 122 A. 865, 33 A. L. R. 821, but it has always been recognized in this court that the granting of such a permissive right was vested in the discretion of the justice presiding, and that the exercise of his discretion

was not subject to exception. It is so declared in the cited criminal cases, and has been recognized in the field of civil litigation in other jurisdictions. *Devine* v. *Johnson & Jennings Co.,* 189 Ill. App. 556; *Louisville & Nashville Railroad Co.* v. *Hurt,* 101 Ala. 34, 13 So. 130; *Maloney* v. *Martin,* 81 App. Div. 432, 80 N. Y. Supp. 763; *Bank of the Northern Liberties* v. *Davis,* 6 Watts & Sergeant (Pa.) 285. All of these cases are cited in appellants' brief.

This exception, so far as it challenges the ruling denying the appellants the right to cross-examine Mrs. Evelyn Paradis, might be dismissed on the ground that it was made in the exercise of a discretion that is not subject to exceptions, but reference to the record discloses that counsel was permitted to examine the witness exhaustively in connection with the factual recitals carried in Exhibit 2, and that she answered questions dealing directly with substantially every such recital. On many occasions, it is true, she gave answers which minimized the force of statements carried in absolute terms therein, as where she said, when asked if the testator once declared, in referring to his trip to the office of the scrivener to make the will, "no matter if I say no I'll have to go," that he "had a smile on his face when he said it."

The additional rulings challenged by this exception were made in strict accordance with established precedents in this jurisdiction and in others. The law does not look with favor on permitting a party to call a witness and proceed to demonstrate his lack of credibility when his evidence is disappointing. It was declared in the first volume of the published reports of this court that:

> "the party calling a witness shall not be permitted
> to attack his character by general evidence",

although it was recognized, even then, that he might disprove facts to which such a witness had testified. *Morrell* v. *Kimball,* 1 Me. 322. There has been no departure from this general principle in subsequent years, although exceptions

to it have become well established when a party is required to call a witness who has subscribed to a document which must be proved, *Dennett* v. *Dow,* 17 Me. 19, or is surprised by unfavorable testimony given unexpectedly by one he has called to the stand, *Hartford Fire Insurance Co.* v. *Stevens,* 123 Me. 368, 123 A. 38. See also *Gooch* v. *Bryant,* 13 Me. 386; *Brown* v. *Osgood,* 25 Me. 505; *Chamberlain* v. *Sands,* 27 Me. 458; *Shorey* v. *Hussey,* 32 Me. 579; *State* v. *Knight,* 43 Me. 11; *Harmon* v. *Perry,* 133 Me. 186, 175 A. 310. In *Dennett* v. *Dow, supra,* the establishment of the exception applicable to subscribing witnesses was protested in a dissent on the ground that it was unwise as having:

> "a tendency to unsettle the law of evidence by preferring the particular benefit to the general good."

The rule applicable to surprise is well stated in *Hartford Fire Insurance Co.* v. *Stevens, supra,* but a limitation on it is expressed very forcibly in *Bank of the Northern Liberties* v. *Davis, supra.* Therein the court, recognizing that the authority was discretionary and that a party had the right to protect himself from the treachery of a particular witness by proving his case through others, negatived the appellants' claim completely by saying that:

> "In such cases, and others of similar kind, the court before whom the cause is tried, has always, in the exercise of a sound discretion, allowed the party calling him (a treacherous witness) to prove that at different times and in the presence of other persons, he has held different language. This, however, is not substantive evidence of itself, but is permitted to neutralize the evidence given by the witness."

To the same effect see *Akins* v. *State,* (Okla.) 215 Pac. (2nd) 569; *State* v. *Lane,* (Ariz.) 211 Pac. (2nd) 821, and the cases cited in the Note in Ann. Cas. 1914 B, 1121 at 1134, under the caption "Effect of Impeachment."

The rulings which denied the appellants the right to introduce Exhibit 2 in evidence to prove the truth of the fac-

tual recitals carried in it, or to permit other witnesses to testify that Mrs. Paradis had asserted such recitals to be true, at some time or times, were proper. If the appellants had produced any evidence, through other witnesses, competent to prove any of those facts, or tending to do so, and her testimony had been of opposite effect, the evidence they sought to offer would have been proper to minimize the force of her statements, but such is not the situation presented in the record before us. In the partial record accompanying the Bill of Exceptions, including those parts of the testimony quoted in it, there is no evidence whatsoever having any tendency to prove any part of those factual recitals. A careful reading of the testimony given by Mrs. Paradis, and of Exhibit 2, furnishes ample proof that she is not the type of witness whose evidence would carry convincing weight. Such a reading makes it apparent that her own wishes, for a cause we cannot know, induced her to desire that the will be disallowed when the case was heard in the Probate Court, and to favor its allowance at the time of the hearing in the Supreme Court of Probate. No witness whose evidence is colored by personal feelings can furnish credible testimony to support the cause she favors.

The will in question was executed in accordance with the requirements of our statute of wills, by a person of sound mind within the purview thereof, as the appellants admit by their statement that the evidence heard in the Supreme Court of Probate would justify a factual finding to that effect. Their claims that the testator was influenced, in the making of it, by fraud, coercion or undue influence are not supported by any evidence in the partial record accompanying, or forming a part of, their Bill of Exceptions. They could not have been supported effectively by the evidence excluded under the rulings challenged by the second and third exceptions.

*Exceptions overruled.*